# Robert M'Clenachan *against* John Curwin.

The turnpike company, under the act of 9th April 1792, are not bound to make compensation for the soil, gravel or stone in the track of the road, nor to put up new fences where the road runs across the field, and the fence is thrown down : *aliter*, where it goes lengthwise along the road, or for damages done to real improvements on the track.

TRESPASS *quare clausum fregit.* The following case was stated for the opinion of the court, and agreed to be considered in the nature of a special verdict.

Under the act of assembly, passed the 9th April 1792, entitled, " An act to enable the governor of the commonwealth to incorpo- "rate a company for making an artificial road from the city of " Philadelphia to Lancaster," a company was incorporated by the name, style and title, "of the president, managers and company "of the Philadelphia and Lancaster turnpike road," for the purpose of making an artificial road from the city of Philadelphia to the borough of Lancaster, which road was, under the authority of that law, laid out by the said company over the cleared, tilled *363]* *and inclosed lands of the plaintiff, situated in Chester county, and was afterwards made and completed in such manner, as in the said act is mentioned.

And afterwards, to wit, on the first day of August 1794, the defendant, then being superintendent for the said company and acting by their commands, entered on the aforesaid land of the plaintiff, along the route or track so laid out for the said road; and for the length of 100 perches and in breadth 50 feet, over and along the said route or track, dug up the cleared and inclosed land of the plaintiff, and overlaid the same with the stones and

gravel for the said road, and also then and there threw down the inclosure of fence of the said plaintiff, over and across the said route or track.

No appraisement of the land so overlaid, nor of the damages done by throwing down the said inclosure, has ever been made, nor has any money ever been paid or tendered to the said plaintiff for the same; nor was his permission ever obtained for the entry upon, or overlaying the said route or track, or breaking down his said inclosure.

On the 11th July 1681, William Penn, the first proprietor of Pennsylvania, made and executed a certain instrument in writing, entitled "certain conditions or concessions agreed upon by "William Penn, proprietor and governor of the province of "Pennsylvania, and those who are the adventurers and pur- chasers in the same province." (*prout* the same instrument.)

No such great roads or highways, as in the said written instrument are mentioned, were first laid out and declared to be for highways, before the dividend of acres was laid out for the purchasers; but in lieu thereof, and with the assent of the said William Penn, and the adventurers and purchasers, an allowance for such roads and highways of six acres for every hundred acres, over and beyond the said quantity of every hundred acres, was from the first settlement of Pennsylvania made by the said William Penn, in all his grants of lands in Pennsylvania, for which said allowance no price or sum of money was ever charged or paid; and a like allowance for the like purpose hath ever since been made by the successors of the said William Penn, and by the state of Pennsylvania. It is agreed, that all the acts of assembly of Pennsylvania, whether now in force or not, that either party may think material, shall be considered as a part of this case.

If upon these facts, the law shall be with the plaintiff, judgment shall be rendered for him, and a writ of inquiry of damages *awarded for him. But if the law shall be with the defendant, then the judgment shall be rendered for him.　[*364

T. Ross, *pro quer.* W. Lewis, *pro def.*

This case was argued last term by Mr. T. Ross for the plaintiff, and by Mr. Lewis for the defendant; and again this term by Mr. E. Tilghman for the plaintiff, and Mr. Ingersoll for the defendant.

The counsel for the plaintiff divided their argument into four general heads. 1. Can private property be taken for a road, without compensation? 2. Does this turnpike act impose the conditions of compensation for the soil, gravel, fencing, &c.? 3. Does the allowance of six per cent. confer a mere right of passage, or give a right of property? 4. If this allowance continues public property, and gives a right of way, is it inherent

in the whole community, or can it be conferred on a few, as a company?

1. By the 1st section of Chap. 1, of the state constitution of 1776, it is declared, that all men have a natural, inherent and unalienable right of acquiring, possessing and protecting property. And by the 8th section thereof, no part of a man's property can be justly taken from him, or applied to public uses without his own consent, or that of his legal representatives. 1 St. Laws, Append. 55.

By the 10th section of the 9th article of the present state constitution, it is provided that no man's property shall be taken or applied to public use, without the consent of his representatives, and without just compensation being made. 3 St. Laws 54. These provisions, which are paramount to all laws, seem sufficient guards to individual property.

Great Britain does not enjoy a written constitution. Their parliaments have been deemed omnipotent. But even in England, if a new road is laid out, the consent of the owners of the lands through which it passes, must be had. The legislature alone can appropriate the interests of individuals to a public use, and never do it unless they make full compensation therefor. 1 Bl. Com. 139. An order of sessions for digging materials on private soil, by virtue of the turnpike act, of 29 Geo. 2, c. 67, was quashed. 1 Burr. 377. A special action on the case lies for paving a street in the front of the plaintiff's house, by which the passage and lights to the house were obstructed. 3 Wils. 461. On this head, the court is also referred to 10 Co. 141, and 12 Co. 12.

By the 6th section of the royal charter to Mr. Penn, it is pro-
*365]    *vided, that the laws for regulating and governing property, shall be the same as in England, until otherwise altered; but the laws of the province shall not be repugnant, or contrary to the laws of England. 1 St. Laws, Append. 3.

The plaintiff then having an exclusive right to the 106 acres contained in his patent, granted to him by metes and bounds, he has a legal as well as constitutional claim to compensation for any injury done him therein by the artificial road. His private rights have been violated, and no law can be made, which devests one citizen of his freehold and vests it in others, even with compensation. 2 Dall. 312.

2. The legislature never intended to apply individual property to public use, without a just compensation. Where a statute derogates from the rights of property, or takes away the estate of a citizen, it ought to be construed strictly. 2 Dall. 316. And no liberal construction of this law should be made in favour of the company. The 2d section of the incorporation act, (3 St. Laws 249) empowers them to purchase all such lands, as shall be necessary to them in the prosecution of their works. By the 9th section, the president, &c. may enter upon the lands, in,

over, contiguous and near to which the track of the road shall pass, first giving notice of their intention to the owners, and doing as little damage thereto as possible, and repairing any breaches they make in the inclosures thereof, and making amends for any damages that may be done to any improvements thereon, by appraisement, &c., and upon tender of the appraised value, may dig, take and carry away any stone, gravel, sand or earth, there, being most conveniently situated for making or repairing the said road. The 8th section exercises the right of entry on the lands through which the road may pass ; but though the entry be lawful at first, it may by subsequent conduct unaccompanied by the acts prescribed by the law, become *tortious ab initio.* The terms in the 8th section, in, through and over, expressly relate to the track of the road, and afford a clue to the following section, where the word *through* is omitted. The expressions *in* and *over* are retained, and the latter must necessarily refer to the ground, through which the road passes. The company must do as little damage as possible, and repair breaches they may make in the inclosures thereof, and make amends for any damages done to any improvements thereon. They prostrate the fences at their peril, and the essence of the provision is, that the fields shall be reinstated with inclosures. They must repair the breaches in the fences where they can ; and where this cannot be done, by reason of the road passing through an inclosure, they must make up new fences, to secure the grain *growing from injury. The word *thereon* shews clearly the meaning of *thereof*, and points it to the route of the [*366 road. *There* in the close of the section includes it, as well as other lands contiguous. The company must dig the soil, in order to shape the road. It is stated here, that the road was laid out through the cleared, tilled and inclosed lands of the plaintiff. These may therefore be denominated his improvements, and amends must be made for the damages done thereto, which must include the soil itself. The act of 1700, (1 St. Laws 16) directs that no road shall be carried through a man's improved lands, but where there is a necessity for the same ; and the value of so much of the improved lands as shall be taken up for the road, shall be paid to the owner out of the county stock. What the practice has been under this law, it is not easy to determine. It has varied much.

3. The allowance of 6 acres per cent. for highways in the proprietary grants, never gave more than a mere right of way. The right of property still continues in the owners, who having a mine on the road, may exercise their right of digging ore, leaving a passage of proper extent. But the free right of passage as contemplated by William Penn, is negatived by the company, who will suffer no one to travel the public road unless he pays for it. The reasonableness of the toll is of no moment. The question is, as to the right of imposing it. A free right of way was intended to be given to all travellers. Strangers are

affected by the claims of the company ; they were not bound to
pay for the repairs of roads.   It is idle to say, that a man pos-
sesses a right, when it is dependent on the will of another.   It
has always been deemed an absurd thing, when the British na-
tion reserved to themselves the privilege of cutting logwood in
Campeachy, at the end of the seven years war, that they sub-
jected themselves to pay for the same to the Spaniards, who
might therefore exact what terms they pleased.

The 6 per cent. were introduced in lieu of the original conces-
sion of the proprietaries.   However equal and just it might be
to carve roads out of the grants originally, yet it would be
highly unreasonable to do so, when large tracts are cut up into
parcels ; as in the vicinity of towns, where individuals have ac-
commodated themselves with lots at a great expence.   The pub-
lic collectively considered, cannot be tenants in common with
private persons in lands, nor can they appropriate such lands at
their will and pleasure.   The soil of a highway belongs to indi-
viduals ; the community have only a right of way. 2 Stra. 1004.

4. But admitting, that the legislature may appropriate the
surplus lands for the original purposes, they can have no preten-
*sions to vest them in corporate bodies for private emol-
*367]  ument.   The present company can have no claims supe-
rior to individuals.   They consulted their immediate interests
when they offered to make an artificial road, and must be resem-
bled to applicants for a private road, who are bound to pay for
the land, and make amends for all damages.   It will not be pre-
tended, that the first proprietary ever intended this allowance
for roads as a fund for speculation ; nor will it be denied, that
he meant them to be as free as the element of air.   He never
contemplated an extinction of the right of the owners for private
purposes, or to change the character of the original contract.   If
public and private interests must be combined, let it be done on
the only rational principle, of making full compensation to the
parties who are injured thereby.   *Fiat justitia, ruat cælum.*

The counsel for the defendants readily admitted, that pri-
vate property could not, by the terms of the constitution, be
taken for public uses by the legislature without compensation.
Our roads do not rest on the same footing as those in England,
and therefore cases from the books are perfectly inapplicable.

Soon after the royal grant, the proprietary conceded that
" great roads from city to city not to contain less than 40 feet
" in breadth, should be first laid out and declared to be for high-
" ways, before the dividend of acres be laid out for the purcha-
" sers," &c.   It was soon found that these concessions could not
be executed as to roads, as well as in another instance, that the
proportion of lands to be laid out for every purchaser in the first
city, should be 10 acres for every 500 acres purchased.   The
first vessel sailed from England to Pennsylvania in August
1681, and arrived in October following.   It could not be then
known what great towns and cities would be laid out, and hence

[M'Clenachan v. Curwin.]

a compliance with the concessions as to roads was rendered impracticable. It became a measure of necessity, to allot the dividends of lands to the purchaser immediately; and therefore, in lieu of those concessions, as the case states, an allowance of 6 acres per cent. was made to every grantee for highways, over and above the quantity he contracted and paid for, by the assent of the proprietary, and the adventurers and purchasers. It is now too late to question the validity of this alteration; it was sanctioned by early laws; among others, by an act passed at Newcastle in 1700, (1 St. Laws, Append. 37) and another in Philadelphia in 1711, (Ib. 39) in the last section whereof it appears, that no rent was to be paid to the proprietary, his heirs or assigns, for the allowance of 6 per cent. It necessarily follows, that every grantee holds this surplus in trust for the commu*nity. The owners of the lands have the usufructary [*368 benefit thereof, until the public interests render it necessary that they should surrender it up for its original purposes. Admit that large tracts have been subdivided; the trust descends on every subdivision, and no person has it in his power to change the original tenure. Every purchaser is bound to know this truth; and if it has happened in one or two solitary instances, that a larger portion than 6 per cent. has been exhausted for roads out of an original survey, it cannot be denied that the chance is far otherwise. The clause in the act of 1700, relating to improved lands being paid for out of the county stock, includes only cartways leading into the great provincial or state roads; but the value of the latter was never at any time paid to the owner. As to lands occupied by private roads, they were to be paid for by the parties applying for and using the same. 1 St. Laws 290.

It never was contended that the state held the land as tenants in common with the owners, but only, that they had an undoubted right to resume the allowance granted for highways, whenever they judged it expedient for the common benefit.

The powers exercised by the parliament of Great Britain, as to highways, may be seen in the statute of 37 Geo. 3, c. 78, by referring to 2 Burn's Just. 383. (14th edit.)

If the legislature by the instrumentality of viewers, can appropriate this surplus land for public roads, have they not the power of conferring the same right on a corporate body, in ease of the public treasury? The object of a good road is obtained, and none but those who make use of it, pay for making it and keeping it in repair. What difference can it make to the owners of lands, through which it passes, whether the road is made by commissioners under a public tax, or by the turnpike company? It would be strange indeed, that the public should be called upon to pay for land, originally intended as a road, for which the original owner never paid any consideration, or quit rents to the proprietaries!

[M'Clenachan v. Curwin.]

SHIPPEN, C. J. on the last argument, desired the defendants' counsel to confine themselves to the point of making up the fences, where they had been thrown down by the company, concerning which, the court had great doubts; but on the subject of payment for the soil of the land over which the road passed, the court were perfectly satisfied.

The plaintiff has contended, that the company are not only bound to pay the owner for the right of soil, the right of passage, the stones and gravel in the track of the road, but are obliged to make new fences for him on both sides of the road, *369] *where it passes through his old fields! This would be more grievous to the stockholders than subjecting them to pay for the land itself, occupied as a road. For the same principle which would compel them to make new fences, must operate to keep them perpetually in repair.

The company have no hesitation in declaring, that they feel themselves bound to pay for stone, gravel and other materials in the vicinity of the route, and to repair any breaches they may make in inclosures contiguous and near thereto, and also to make amends for any damages done to any real improvements on the track of the road, such as prostrating buildings, cutting down fruit trees, &c. but they cannot consider themselves liable to put up fences, where the road goes through an inclosure, either under the spirit or words of the incorporating act. As to stone, gravel, sand or earth, found on the track of the road, they certainly are not bound to pay, if they are not compellable to pay for the land itself, being considered as public property. The word *there*, in the close of the 9th section, necessarily refers to the adjacent lands : for it is said, on tender of the appraised value, the company may dig, take and carry away any stone, &c. To carry away materials to be used for making the road, from the road itself, would be a strange absurdity.

The difficulty arises from the introduction of the term, improvements, in the 9th section. If it had been inserted in the section preceding, no doubt could have remained, as will be seen by examining the several clauses of the act.

The 2d section gives a general capability to the company to purchase lands. They might have occasion for a greater width of ground than 50 feet, and hence the supplement of the 17th April 1795, was passed, authorizing them to purchase additional ground, where no former road had been laid out, but so as not to exceed 68 feet. 1 St. Laws, 751.

It has been properly observed by the plaintiff's counsel, that the expressions in the 8th section, afford a clue to the construction of the succeeding section. The 8th section gives a power to enter generally upon lands, &c., "in, through and over which, "the intended turnpike may be thought proper to pass, and to "examine the ground most proper for the purpose," &c. It is not confined to the track of the road. The 9th section allows

[M'Clenachan *v.* Curwin.]

the range of the neighborhood for materials; it drops the material word *through*, and introduces the additional words *contiguous and near. In and over* more properly refer to the body of the land. Repairing any breaches they make in the inclosures thereof, must relate to adjacent lands. To repair, *ex vi termini*, signifies, to amend or refit. If the road crosses a field, and a few *panels of fence are removed, to effect a passage [*370 through it, the repairing of the breach or re-instating the fence, would defeat the object, by preventing a passage. Making new fences cannot be said to be repairing old ones, without the utmost impropriety. To avoid this objection, our adversaries recur to what they call the essence of the provision; that is, they change the real meaning of a word, in order to infer a conclusion not warranted by the act. If the legislature had intended the company should make new fences, in instances like the present, would they not have said so expressly, and further have described the species, whether post and rail or worm fences? But by our assigning the words in question to the adjacent lands, a correct meaning may be given to every expression. To obtain materials, it may be necessary that the company should enter into enclosures in the vicinity of the road; and in such cases, they give notice of their intention, do as little damage as possible, repair breaches which they may have made in fences, make amends for damages to improvements, and pay the appraised value of any stone, gravel, &c., which they may dig, take and carry away, for making or repairing the road.

The removal of a fence, on the track of the road, has been swelled into a monstrous damage. But is it not *damnum absque injuria?* Would not the legislature and every rational person conclude, that the lands of individuals are increased in value, by a good and permanent road passing through them? When a road of so much general importance was intended to be made for the community, every incidental power of completing it, must be supposed to be conferred on the turnpike company. Their right to dig the soil on the track, shape it and use the materials found thereon, without making payment to individuals, can scarcely be doubted. If however the court should be of opinion, that swinging gates or any other device, which may conduce to the ease of individuals, through whose grounds the road passes, may be contrived, so as not to be deemed nuisances, or interfere with the great design of a turnpike road, the company are perfectly disposed to meet the recommendation of the court.

The form of the action appears objectionable. It is trespass *quare clausum fregit;* but the more proper species of suit, would be a special action on the case. If the law is not unconstitutional, the defendant was justifiable in his entry on the lands by the 8th section of the act. To construe the superintendent and workmen of the company as trespassers, by entering on the track of the road, and overlaying it with stone, or throwing

[M'Clenachan v. Curwin.]

down a fence erected across the route, the road would be at once annihilated.    But we wish a decision on the merits of the case.

*371]    *SHIPPEN, C. J. now delivered the opinion of the court; but YEATES, J. being a stockholder in the company, took no part in the decision.

This is an action of trespass brought against the superintendent of the artificial road, leading from Philadelphia to Lancaster, called the Turnpike Road, for entering on the cleared tilled and enclosed lands of the plaintiff, situate in the county of Chester, and digging up the said land for a certain distance, and overlaying the same along the route or track of the said road with stone and gravel, and for throwing down the inclosure or fence of the plaintiff over and across the said route or track, without having made any compensation for the said land, and for the injury done to his improvements.

The question turns partly upon the validity, and partly on the true construction of the act of assembly of the 9th April 1792, impowering the turnpike company to make this artificial road.

The validity of the act is impeached by its being repugnant to the constitution of Pennsylvania, which directs, that no man's property shall be taken for public use, without his own consent, or that of his legal representatives, nor without compensation.

To this it is answered, that the road or track of the road running through the plaintiff's land was not his separate property, for that he held it as a trustee for the public, under the grant of the late proprietaries of Pennsylvania, in which he was allowed beyond the quantity of land actually purchased and paid for, 6 per cent. for roads and highways.

This will lead us to consider the different kinds of lawful roads and highways in Pennsylvania.    There are, and have been for a great length of time, three different kinds of roads : 1st, The great provincial roads, called in the act of 1700, the "king's "highways" or "public roads," which were laid out by order of the governor and council.    2d, The roads or cartways leading to such great provincial roads, laid out by order of the justices of the county courts, after a return of certain viewers, that the same was necessary for the convenience of the public ; such parts of these roads as run through any man's improved grounds were to be paid for out of the county stock.    The 3d kind were called private roads, likewise laid out by order of the county court, on the application of any persons for a road to be laid out from or to their plantations or dwelling places, to or from the highway.    The improved grounds through which these roads were run, were directed to be paid for by those, at whose request, and for whose use the same were laid out.

As to the first of these roads, called in the act the king's high-
*372]    ways or public roads, they were one of the objects of what is *called concessions, made by the first proprietor William Penn, to those original purchasers in England, by whose

[M'Clenachan v. Curwin.]

assistance he expected to found the colony.    By this instrument, dated the 11th July 1681, it was agreed, that when the adventurers should arrive here, a certain quantity of land or ground-plat should be laid out for a large town or city, upon the river Delaware; that every purchaser should by lot have so much land therein, as would answer to the proportion which he had bought in the country.    But previously to laying the dividends for each purchaser, it was directed, that the surveyors should lay out the great roads from city to city, or to great towns, as well as the streets in such great towns or cities.    The grounds to be occupied by these great roads and streets, were evidently to be out of the proprietor's lands alone.    On the arrival of the adventurers in this country, it was found very practicable to lay out streets in one great city, which was accordingly done; but quite impracticable to lay out the great roads or highways from city to city, as only one city was then contemplated.    But as such great roads were to be laid out over the land of the proprietor alone, and the purchasers were not to contribute, it was at length agreed and sanctioned by the early laws of the province, that in lieu of the impracticable plan settled in England, there should be an additional quantity of land granted to each purchaser without price or rent, to enable him to contribute without loss to such public roads as should thereafter be found necessary for the use of the inhabitants.    In this plan there was evidently a chance, that the purchaser might be either a gainer or loser in the event, as it was then and would probably continue for a long time uncertain, how much of each man's land would be found necessary for such public roads.    The quantity of 6 per cent. was however fixed as the permanent quantity to be added to every man's land for that purpose ; and from that early period to the present time, no grant has been made either by the proprietaries or the commonwealth, without this addition of 6 per cent. expressly for the purpose of contributing to the establishing the roads and highways.    It is true, that it is not for these great roads alone, that they are to contribute, as but few of them are necessary ; but, by the law of 1700, although a compensation is directed to be made for the improved land of any person, through which the second species of roads or cartways are run, yet as to the woodland or unimproved grounds there is no compensation to be made, evidently contemplating their liability to contribute on account of the additional 6 per cent. granted them to supply the roads and highways.    Although in this early arrangement, there might be a chance that certain purchasers might *be obliged to contribute more than the 6 per cent. to the roads, yet it might possibly have been foreseen, that [*373 scarce any instance of that would occur, without an equivalent likewise accruing to the purchaser, from the vicinity of such public roads to their buildings and improvements.

    Even in the latter law, establishing private roads, the legislature appears to have contemplated the same liability in the pur-

chasers to contribute to the roads, the allowance to be made by those who use the road being expressly confined to the improved lands, through which such roads run, considering, that though they ought to be paid for what by their labour they had made valuable, yet, as to the land which lay in a state of nature, they were bound to contribute as much of it, as by the laws of the country, were deemed necessary for the public convenience. If then as to these inferior kinds of roads, the legislature has sanctioned the original idea, can it be doubted, that with regard to the great provincial roads, being of so much more general utility, they should be exempted from a proportionable contribution?

We cannot therefore consider the legislatures applying a certain portion of every man's land for the purposes of laying out public roads and highways, without compensation, as any infringement of the constitution ; such compensation having been originally made in each purchaser's particular grant. But it is objected, that even if the legislature might do this themselves, yet they could not grant the right of doing it to individuals or a corporate body for their own emolument, so as to deprive the inhabitants or travellers, of the free use of the road, by imposing tolls, or other restrictions in the use of it. To this it may be answered, that such an artificial road, being deemed by the legislature a matter of general and public utility, and considering that it was not to be effected but at a considerable expence, and that the expence could not be defrayed, nor expected to be defrayed in the ordinary way, by the inhabitants of the several townships through which the road was to run, they devised this mode of accommodating the public with such a road at the expence of private individuals, who from a prospect of deriving some small profit to themselves, might be induced to do it ; it was immaterial to the public whether it was done by a general tax to be laid on the people at once, or by the gradual payment of certain specified sums by way of toll on those who used the road only, the latter being considered as the most equal mode of defraying the charge of making and keeping such road in repair. For although every man has a right to the free use of a public road, yet every member of the community may be taxed for *making that road, in any manner that the legislature may think reasonable and just.

*374] 

There has been great difference of opinion at the bar, as to the 9th section of the act. I have not been without my doubts, but have at length satisfied my mind as to the construction of it. The words, in, over, contiguous, and near, to the route and track of the intended road, appear to me to include both the track of the road, and the adjacent lands ; and that the words, repairing the breaches they make in the inclosures thereof, and making amends for any damages that may be done to any improvements thereon, likewise relate to both ; but may be satisfied without obliging the company to erect new fences on each side of the

The clause to labour, &c. in the policy, relates only to acts done before abandonment. The acts of the captain shall not prejudice the right of abandonment. 1 Term Rep. 608.

On the other hand it was insisted, that though the broker was originally applied to by the insured, yet in the progress of the business, he becomes the agent of both parties. This is the general idea, and one striking circumstance proves it, that in insurances of property no one ever counted on the accountability of the broker. Whether an agreement be made by the parties personally, or by a broker mutually employed, it is equally binding. 1 Dall. 420. In the Supreme Court of the United States, Duncan *v.* Coates, Judge CHASE held that a verbal notice of abandonment to an insurance broker was sufficient. Demanding payment as for a total loss is equivalent to abandonment;— said by the counsel on one side and not denied by the other or the court. 8 Term Rep. 273. But the plaintiff is under no necessity of relying on this point, since notice to the defendant himself of the abandonment may fairly be inferred from his meeting the other underwriters, to consult on the loss, immediately after the date of the letter of the 27th January 1794. A relinquishment of the abandonment will not be implied against the express declared intention of the party in the act of cession.

The court were of opinion, that though the broker in the first instance might with the strictest propriety be deemed the agent of the party employing him, yet when the policy is effected, he necessarily becomes the agent of both parties. He receives the premium for the underwriters, and settles the proportional *quotas* in case of a loss. In the reason of the thing, founded on common experience, a notice of abandonment to him must be sufficient. The costs of the appeal may be involved in the other point, about which the brokers have disagreed, but the relinquishment of the *abandonment cannot be implied under the circumstances of this case. [*379

It was urged as a ground of defence, that the decrees of the admiralty courts in Jamaica and Great Britain precluded the plaintiff from recovery. The sentence of a court of admiralty, binds all the world as to every thing contained in it. Where the condemnation goes upon the ground that the vessel was not neutral, it is conclusive evidence. Parke, 403. (1st edit.) This fully appears from the cases of Barzillay *v.* Lewis, cited Ib. 410, and Saloucci *v.* Woodmass, Ib. 413. Whenever the sentence is general and no special ground is stated, it will be conclusive and binding, and other courts will not assume the office of reviewing the proceedings of a forum, having competent jurisdiction of the subject matter. Ib. 417. Where property has been condemned as lawful prize, without expressing a ground, it will refer to the libel. Prizes are acquisitions *jure belli.* Doug. 585, 591. And in the Supreme Court of the United States, in February term 1800, Vasse *v.* Tingey, Judge WASHINGTON observed, that prize

was property taken from an enemy *jure belli*.   Here the decree condemns the cargo, either as wholly belonging to French citizens, enemies of Britain, or that a part of it being clearly ascertained to be French, and blended with other property about which there was no credible proof, and the captain having grossly · perjured himself in material facts with a design to disguise and conceal the truth, the judge found it out of his power to discriminate, and condemned the whole in one mass.   There is nothing dubious in the sentence.   It rests not on foreign ordinances, contravening the law of nations.   It ascertains that the cargo belonged to the enemies of Great Britain, whereas the plaintiff's property was insured as American.   Of what moment then can it be, that there is no warranty that it was American property?   It was represented as such, and by the sentence in the admiralty, it is found to be otherwise, to which implicit credit is to be given. The case of Christie *v.* Secretan, 8 Term Rep. 192, will be cited against us.   The point there determined, was, that an American vessel, which the broker refused to warrant, having all the documents on board required by the treaty between France and America, but not having the *Roll d'Equipage* required by the French ordinance, and being afterwards condemned in Nantes, the insured had a right to recover.

The plaintiff answered, that the ground of condemnation did not expressly appear by the sentence, and therefore he was not concluded thereby.   All the decisions settle a material difference between policies with, and without a warranty.   Whatever solidity there may be in the distinction, considered upon principle, *380]   *it certainly has obtained; and in all the cases wherein the decrees of foreign courts of admiralty have precluded the insured from recovery, there have uniformly been warranties. Lord Chief Justice KENYON asserts this to be the law in the case cited.   8 Term Rep. 196.   And where a loss has been proved by the insured, the burthen is thrown on the insurer, to shew why he should not be responsible for the loss. Ib. 197. Per GROSE, Just.   And of this opinion was the court.

The defendant's counsel admitted, that a policy subscribed in time of peace, continued binding though a war should break out; but further insisted, that here was an express warranty against illicit or prohibited trade, and the brig had notwithstanding been engaged in such trade.   Contraband articles affect innocent parts of the cargo, belonging to the same person. 1 Robins. Admty. Cas. 26.   The vessel will even be forfeited thereby. Ib. 165.— Where papers are suppressed, it must be considered as a proof of *mala fides;* and where that appears, it is an universal rule, to presume the worst against those who are convicted of it. Ib. 113. In prize courts, the rule of *falsus in uno falsus in omnibus*, is a rule of unexceptionable justice. Ib. 213.   Transporting enemy's property under false papers and a false mask, is cause of confiscation. Ib. 135.   The master is the agent of the owner of the

[Crousillat *v.* Ball.]

vessel, and can bind him, by his contract or his misconduct. 2 Rob. 70, 71, 127, 131.

When it is generally said, that in case of a war breaking out, the insurers must bear the risk, this restriction must naturally exist, that the insured must conduct themselves by the strict rules of neutrality. So every ship insured, must at the time of the insurance, be able to perform the voyage, unless some external accident should happen. Parke, 249. 5 Burr. 2804. Every neutral vessel should have all the papers necessary to shew her neutrality. If she has them not on board, the underwriters will be excused. 8 Term Rep. 197. The ship must not forfeit her neutrality by the conduct of any one on board. Ib. 230. The insured must prosecute the voyage in the policy without doing any thing to the prejudice of the insurer, so as increase his risk. Ought the master to have accepted on freight, the goods of the French citizens of St. Domingo, disguised as American property, under false marks? Ought he not candidly to have declared on his capture, the true state of the property on board, instead of concealing his papers, and adding to his former weakness the crime of perjury? The risk to the insurers, is as much increased by this improper conduct, as if he had hired his vessel to one of the belligerent powers, or entered a harbour, while in a state of blockade.

*The plaintiff's counsel observed, that the policy respected a certain species of illegal trade; a smuggling [*381 voyage to a French and Spanish island, was contemplated and mutually understood by both parties. The illicit or prohibited trade in the policy, applies to a violation of the revenue laws. The homeward cargo consisted of West India produce, and not the contraband articles referred to in Dr. Robinson's reports. The decree in the admiralty does not express the prohibited trade as the ground of condemnation; if it had been considered as such, we should have been sure to have heard of it, from a British West India judge. It is admitted, that the conduct of captain Price is highly reprehensible, and that he has gone much too far to assist the interests of his owner. Still he was not totally to be disbelieved. But if he was even guilty of corrupt perjury, it will not convert the property of the plaintiff into French property, so as to influence the decision of the present cause. The risk of future war is taken by the underwriter in every policy. Dougl. 708. Throwing papers overboard, is a strong ground of suspicion, but of itself, is not a sufficient ground of condemnation, says Lord MANSFIELD. Dougl. 560. And per BULLER, Just. The wilful throwing of papers overboard, is only presumptive evidence of enemy's property. Ib. But in what particular, has the captain broke the rules of neutrality?— Where is the warranty for his neutrality?—The policy was subscribed in a state of peace.—If the goods of a belligerent are openly taken on board a neutral vessel, this is no breach of neutrality; the property when captured by the enemy, is liable

to condemnation, but the owner will be entitled to his freight. If the property was attempted to be covered, the freight would be lost; but in neither case, would it be a ground of condemnation of other goods belonging to other persons, nor would the underwriters in either case be discharged. The true question is, had not the plaintiff property on board, to the amount of the sum insured? Of this the jury have had abundant proof; and if a loss has happened in the course of the voyage insured, the plaintiff is entitled to a recovery, within the terms of the policy.

After the counsel had fully spoken to the cause, SHIPPEN, C. J. delivered the charge of the court to the jury, substantially as follows:

It is a settled principle, that policies of insurance shall always be construed according to the intention of the contracting parties, and not according to the strict and literal meaning of the words. Parke 33. They shall be taken largely for the benefit of *382] \*trade, and for the insured, and the usage of trade may be called in to explain any doubts. Ib. 44. 1 Burr. 348. Insurances made in time of peace continue, though a war should break out; but it would be inequitable that the insured should do any thing in the voyage insured, which should add to the risk of the insurer. The latter runs sufficient risks in the event of a war, without being subjected to new chances. The case of deviation may be fairly brought in by way of analogy. If there is a voluntary departure without necessity, or any reasonable cause, from the regular and usual course of the specific voyage insured, the underwriters are discharged from any responsibility. Nor is it at all material, whether the loss be or be not an actual consequence of the deviation; for the insurers are in no case answerable for a subsequent loss, in whatever place it happen, or to whatever cause it may be attributed. Neither does it make any difference, whether the insured was or was not consenting to the deviation. Parke 335, 336. It seems here, that a smuggling voyage to a French island, was mutually understood to be insured. The captain was the agent and immediate consignee of the cargoes at New Orleans and Port au Prince. On a war breaking out between Great Britain and France, he might perhaps have taken French property on board at the latter port, but be ought not to have masked it as American property, under the false marks of the initials of his owner's name. He should have transacted business in the ordinary mode by signing bills of lading, and having regular invoices of the shipments made for his owner. Whether the West India admiralty judge and the Court of Appeals have given correct sentences or not, it is not our province to determine; but certainly, when it appears that enemy's property has been covered by false marks to a considerable extent, no invoices or other documents to ascertain the plaintiff's interest produced, papers proved to have been privately concealed, and the captain and consignee has been guilty

[M'Clenachan v. Curwin.]

road.   The general breaches of inclosure would certainly be in cases, where the fences run across the intended road, and these could not be re-erected.   But there might be a necessity for taking down fences that run lengthwise along the track of the road.   It not having been unusual in running roads and laying out townships, in order to avoid as much as possible the doing injury to the neighborhood, to run the roads in the line of two neighbouring tracts, the legislature might reasonably suppose such instances might occur in opening this road; and it was therefore proper to oblige the company, to re-erect the fences by the side of the road.   The word, repairing, seems not to carry the idea of new erections, but restoring what had been prostrated.

In opening other roads, public and private of any length, it could scarcely be avoided in many instances to lay open inclosures; but it has never been contended, that either the county or private petitioners were obliged to repair them, by erecting new fences on the sides of the roads.   The members of the legislature must have known this, and would therefore if they had meant it in this case, have provided for it in express words. The truth is, that it has been considered, that the running of a road through a man's land, confers such a benefit on him, as fully compensates him generally, for the expence of fencing his land anew.

I observed before, that the words, in, over, contiguous and near, to the track of the road, extended as well to the road itself, as to the adjacent ground from whence the materials were to be procured, and to the damage done to the inclosure; so likewise I consider it to extend to both, as to making amends for any damages done to the improvements thereon. ° And if it has in any case been found necessary to pull down houses, destroy orchards, or spoil grain in the track or route of the road, the company are undoubtedly bound to make compensation to *the owners, as well as the adjacent grounds from whence [*375 they are to collect the material.   In the present case no such damage is found.   And on the whole case, it is our unanimous opinion, that judgment should be entered for the defendant.

BRACKENRIDGE, J. subjoined, that it ever had been his decided opinion, that in all cases of roads laid out by order of the county courts, where they had been carried through a man's improved lands, the soil of the land was not to be valued and paid for either by the county or the petitioners, but merely the improvements.   This appeared clear to him *ex vi termini;* and no valuation is to be made of woodland.

Cited in 5 Watts 547 in support of the decision that an incorporated turnpike company have the right to dig stone, clay, and gravel, within the limits of its road, for its improvement and repair; and are not thereby subject to an action by the owner of the land.
Cited in 3 Wh. 514 to show that a turnpike is a public highway.

[Crousillat *v.* Ball.]

Cited in 1 W. & S. 351 to show that the legislature has the constitutional right to grant to individuals or to a corporate body the right to appropriate a portion of every man's land, for the purpose of laying public roads and highways, without compensation, such compensation having been originally made in each purchaser's original grant. Cited for the same purpose in 30 Pa. 370; 100 Pa. 366.

Referred to and distinguished in 20 Pa. 96.

Cited in 119 Pa. 564 as containing a statement of Penn's Concessions of 1681.

Since the passage of the act of April 7, 1849, a plank road company is bound to provide fences along the sides of their roads. Plank Road Co. v. Ramage, 20 Pa. 95. See also Plank Road Co. v. Thomas, 20 Pa. 91.