### IN THE

# SUPREME COURT

### OF

# PENNSYLVANIA.

## Western District, September Term, 1813.

THOMPSON *against* JOHNSTON.

### IN ERROR.

A warrant, survey, and patent for lands not purchased of the Indians, and which the proprietaries did not know at the time of granting, to be within the Indian limits, pass no right.

ERROR to the Common Pleas of *Indiana* county, to remove the record of an ejectment for 217 acres and 18 perches of land, brought by *Johnston* the plaintiff below against *Thompson*, in which the following case was stated, to be considered in the nature of a special verdict.

*Title of plaintiff below.* A warrant issued by the Commonwealth of *Pennsylvania* to *Thomas Johnston* for 200 acres of land within the late purchase, dated 17th *May* 1785. A survey of 217 acres 18 perches and allowance was made on the 17th of *July* 1785, by virtue of the said warrant, by *James Johnston* deputy surveyor, adjoining the purchase line. *Thomas Johnston* the warrantee above named, by indenture dated 3d *December* 1798, in consideration of natural love and affection and of one dollar, conveyed the said tract of land to *James Johnston* the plaintiff in fee. The defendant is in possession of the land surveyed as above. The said defendant and a certain *Alexander Taylor* searched the lines of said tract of land about thirteen years ago, and found the purchase line marked differently from other lines; and that the diagram made by *Alexander Taylor* on the 27th of *December* 1809, by virtue of an order of Court, contains a true representation of the surveys of

plaintiff and defendant, and their relative situation, and of the purchase line as run in conformity with the treaty with the *Indians* at *Fort Stanwix* in 1768; and that the land now claimed by plaintiff lies on the north side of said line, and adjoining thereto. The said treaty and purchase from the *Indians*, and the different acts of assembly relative thereto, to be considered as part of the case, and that the purchase line was run and marked agreeably to the acts of assembly, previous to making the plaintiff's survey.

1813.

THOMPSON
v.
JOHNSTON.

*Defendant's title.* An application was entered on the 23d of *July* 1773, for 300 acres in the county of *Westmoreland*, in the name of *Charles Porter.* On the same day a warrant was issued by the then proprietaries of *Pennsylvania* to *Charles Porter* for 300 acres joining *Stephen Porter* in *Westmoreland.* On the 14th day of *October* 1773, a survey was made by *Joshua Elder* deputy surveyor, by virtue of the said warrant, containing 323 acres and allowance, and which survey is fairly represented in the diagram made as above by *Alexander Taylor. Charles Porter* by indenture dated the 8th of *February* 1775, in consideration of five shillings conveyed the said tract of land to *James Cannon;* and the then proprietaries on the 18th of the same month, granted their patent for the land to *Cannon.* The defendant settled on the land in dispute in the year 1796, and has cleared eight or nine acres. The purchase line runs through the tract of land in the name of *Charles Porter;* and the defendant claims the tract under the patent to *Cannon* above mentioned. The purchase line above stated was the boundary line between *Westmoreland* county and the counties thereto adjoining on the north, until the act of assembly, passed the 30th of *March* 1803, erecting certain parts of *Northumberland* and *Lycoming* counties into a separate county called *Indiana;* the same for a certain time came within the jurisdiction of *Westmoreland*, and is now *Indiana* county, and was so at the time of bringing the suit. The commission to *Joshua Elder* contained only an authority to survey within the purchase of 1768. The survey of defendant was made, and patent granted before the purchase line was run by the commissioners. And if upon the whole the opinion of the Court shall be &c.

The diagram of *Taylor* is not material: it shewed the interference of the tracts, and that *Porter's* survey was upon land not then purchased from the *Indians.*

*Forward* argued for the plaintiff in error.

*Ross* contra.

TILGHMAN C. J. *James Johnston* the plaintiff below, and defendant in error, claims under a warrant dated 17th *May* 1785, on which a survey was made 17th *July* 1785. *John Thompson*, the defendant below, claims under a warrant dated 23d *July* 1773, on which a survey was made 14th *October* 1773, and a patent issued 18th *February* 1775. But at the time of the defendant's warrant, survey and patent, the land had not been purchased by the late proprietaries of the *Indians.* The question therefore is, whether any right to land so unpurchased passes by a patent. It is a principle that nothing passes by a deed, where the grantor is entirely deceived as to the object of the grant, unless such deception be without any fault of the grantee, and on a point which the grantor is bound to know. Considering that the surveyor was in some measure the agent of the party who took out the warrant, as well as of the proprietaries, and that it was the *party* who described the land which he wished to take up, I do not think that a survey made in express violation of the rules prescribed for the conduct of surveyors, can be said to be altogether without the fault of the warrantee, although he may not have been guilty of an intended fraud or deception. It was impossible for the proprietaries to be present at the execution of surveys. They therefore laid down general rules for the direction of surveyors, and it is highly reasonable that all persons applying for lands, should be bound by those rules. One of these directions was, to survey no lands beyond the bounds of the purchases from the *Indians;* a regulation founded not only in good policy, but in strict justice. The royal charter did indeed convey to *William Penn* an immediate and absolute estate in fee in the province of *Pennsylvania.* But that great and good man did not conceive that he had a title in *conscience*, until he had obtained the consent of the natives. Accordingly he established it as a principle, which was fol-

lowed by his successors, and has received the approbation
of all mankind, to grant no lands which had not been pre-
viously purchased of the *Indians*. In this he was supported
by the legislature, who at a very early period made it penal
for any individual to settle on the *Indian* lands, or even to
make a purchase from them. The consequence was what
might be expected. The *Indians* entertained a lasting sense
of gratitude and good will to the proprietaries and go-
vernors of *Pennsylvania*, and were less disposed to war with
that province than with others, where principles less equita-
ble had been adopted. If the proprietaries had been inform-
ed of the truth of the matter, we may be morally certain,
that the patent in this case would not have been issued, nor
is it pretended that it ought to have been issued. But it is
said that having issued, the legal estate passed. But that is
begging the question; for it is contended on the other side
that the grant was *void*, in consequence of the deception.
We are not without authority for this opinion; for it was
determined before the revolution in the case of *The Pro-
prietaries* v. *Samuel Wallis*, that patents were *void*, which
were issued for lands in the proprietary *manors*, surveyed
contrary to standing instructions, and done in such a man-
ner, that the secretary and surveyor general were imposed
on. It was also decided at *Nisi Prius* in the year 1796, in the
case of *Weiser* v. *Moody*, that nothing passed by a patent
for lands *beyond the bounds of the purchase*, unless the pro-
prietaries or their superior officers were acquainted with
the true situation of them. It may be asked, what in such
a case does equity require? The answer is plain. When
the patentee has been guilty of no fraud, he should either
be permitted to survey an equal quantity of *other* land, or
have his money restored to him with interest. But equity
would not require that he should have the *identical land*,
*illegally* surveyed in 1773, which has been since *legally*
surveyed and sold to another under the authority of the
Commonwealth. This would be doing wanton injustice to
the subsequent purchaser. In the present instance there is
no allegation of fraud, but there certainly was negligence or
carelessness in the surveyor, or the warrantee, or both. The
purchase line had not been actually run; it was therefore
incumbent on the surveyor to keep at such a distance as

1813.

THOMPSON
*v.*
JOHNSTON.

should be clearly within it. At any rate the survey was at the peril of the warrantee. This is the light in which the subject has been constantly viewed by the legislature. In the act for opening the land office, subsequent to the revolution (9th *April* 1781, 1 *Smith's Laws* 532) by which all *imperfect* titles derived from the late proprietaries were confirmed, there is an express exception of lands *not within the Indian purchase;* and in the year 1785, petitions for confirming titles under circumstances similar to the present were rejected. It appears to me therefore that the title of the defendant is defective; consequently the title of the plaintiff, although of later date, stands good. I am of opinion, that the judgment of the Court of Common Pleas be affirmed.

YEATES J. The history of Pennsylvania from its foundation as a colony, furnishes most abundant proof of the fixed resolution of the different proprietaries to dispose of no lands within their chartered limits, which had not previously been purchased from the *Indian* natives. The cultivation of peace with the Aborigines was a measure of sound policy; and combined therewith the individual interests of the lords of the soil. Their solemn engagements not to sell lands beyond the boundaries of their purchases were repeatedly recognized in different conferences with the *Indians.* The usual forms of warrants issued from the land office restricted the surveys to be made thereon within the *Indian* purchases; and the deputy surveyors received written instructions to execute the warrants directed to them, " according to the " express words and order of such warrants, and not other- " wise:" and it is obvious that they had no authority to enter on the *Indian* lands to make their surveys. The purchasing of lands from the natives, or settling thereon, was prohibited by positive law.

No instance can be shewn wherein the proprietary officers have received an application for lands within the *Indian* boundaries; and we are bound to presume that if such applications had been made, they would have been rejected. It appears by the minutes of the governor's council, (*Lib. M.* 151.) that on the 18th of *April* 1752, a commission and license issued to *Andrew Montour* to settle and reside in any place he should judge convenient and central;

to preserve the lands from being settled by others, and warn off all who had presumed to go there, and to report the names of such as had settled there, that they might be prosecuted. In the course of my practice at the bar, two cases only came to my knowledge of ejectments being commenced on surveys made out of the *Indian* purchases; but the plaintiffs never ventured to bring either of them on to trial.

1813.

THOMPSON
*v.*
JOHNSTON.

It appears from the facts agreed on in this case, that the survey under which the plaintiff in error claims the lands in dispute, was made on the 14th of *October* 1773, above eighteen months prior to the running of the lines of the *Indian* purchase, made at *Fort Stanwix*, viz. on the 4th of *May* 1775. The imaginary line therefore between the nearest fork of the west branch of *Susquehanna* and *Kittanning*, could only be guessed at. But if the owner of the warrant under which the plaintiff founds his pretensions, knew at the time that the survey was made beyond the purchase, he was guilty of a fraud of which he or those claiming under him cannot avail themselves. There is nothing on the face of the survey as returned, which could lead the proprietary officers to information that the lands lay beyond the *Indian* purchase; and the deputy surveyor has sworn that his commission contained only an authority to survey within the purchase of 1768.

Assuming it then as a fact, that the situation of the lands beyond the *Indian* purchase made at *Fort Stanwix*, was unknown either to the grantors or grantee at the time of issuing the patent on the 18th of *February* 1775, what is the *law* arising on this case?

It was against the uniform practice of the proprietaries to sell lands unpurchased from the *Indians;* nor was it their intention to do so in the present instance. A mistake had arisen from the want of knowledge in the deputy surveyor of an unmarked boundary of forty or fifty miles in extent, which had never been run; and neither party meant that lands within the claim of the natives should pass. There was not therefore the union of two minds in the grant of the lands in question, under the circumstances of this case.

But what is the plaintiff's *equity?* The lands have been paid for by the patentee at the rate of 5*l.* sterling per one

hundred acres; and as between him and the late proprie-taries, if the consideration has failed either in whole or in part, the former is entitled in good conscience to have the consideration money refunded in proportion to the defi-ciency of his title, together with interest thereon, and his reasonable expenses. The Commonwealth has succeeded to the rights of the proprietaries, and should deal out the same measure of justice as would be incumbent on the latter. Beyond this the plaintiff has no fair pretensions against the state. Besides the relations between the parties have materially changed by subsequent events. Previous to the *Indian* purchase at *Fort Mackintosh*, the land office by an act passed 21st *December* 1784, was declared to be opened for sale of all vacant lands within the state (the de-preciation and donation tracts only excepted) at the rate of 30*l.* currency for every one hundred acres. In pursuance thereof *Thomas Johnston*, under whom the defendant in error holds, has paid for the lands in question at that rate, and the equity derived under him is evidently superior by a positive law to that derived under *Charles Porter*, who paid a very inferior sum for the lands then supposed to lay within the purchase. To give a preference to the latter under such circumstances, would render an illegal act the means of obtaining an undue advantage over the rest of the community.

Such were evidently the grounds of the legislative deter-mination upon the petitions of *James Milligan* and *Hugh Lenox*, presented 22d *March* 1785, (*Journals of Assembly* 235,) and of *William Parr*, *Owen Biddle* and *Clement Biddle*, presented 28th of the same month. (*Ib.* 252). For although the committee on both petitions reported on the 5th of *April* 1785, "that at the times of the petitioners making the lo-"cations and paying the purchase money, it was understood "and believed that the lands were within the lines of the "*Indian* purchase, but that the line which was run from the "western branch of *Susquehanna* to the *Allegheny*, in or "about *April* or *May* 1775, is said to have excluded the "lands so located and returned or part of them;—yet they "were nevertheless of opinion that the claimants had an "equitable claim to have the lands confirmed to the war-"rantees, or their legal representatives or assigns, and re-

"commended a resolution that the prayer of the petitions "should be granted." The legislature however refused to adopt the report, (*Ib.* 286.) and no provision was made in the subsequent law of 8th *April* 1785 allowing a preference in such cases.

Upon the whole I am of opinion that the judgment of the Court of Common Pleas of *Indiana* county should be affirmed.

BRACKENRIDGE J. At the time of the proprietary grant made to the plaintiff in this case, had the charter proprietor a right to the land granted, or has he since acquired a right, so that he could have it in his power to make a title, though originally he had not? The king of *England*, under whom the charter was granted, would seem to have considered himself as having an absolute right to the soil; for there is nothing said as to the rights of the *Aborigines*, or any reservation made in granting the charter. From the first discovery of the continents or islands of *America*, these *Aborigines* were not considered as having any right, not being christians, but mere heathens and unworthy of the earth. The pope, as head of the church, considered himself as having the title paramount and the absolute right of the soil. "The earth is the Lord's and the fulness thereof," says the scripture; and for whose use could it be intended but for that of the heirs of salvation. This was the catholic notion of the right; nor would the protestant church seem to have entertained different ideas as respected the claim of the original inhabitants of the country. For on the crown of *England* becoming protestant, we find no distinction taken, or modification of the grants that were made under it. The *bare* right of discovery is all that is referred to as warranting a right of property in the country so discovered. But the proprietor himself taking the charter, would not seem to have considered it as giving a right paramount and above that of the *Aborigines*; on the contrary he would seem to have acknowledged the right of the natives by purchasing from them. But it is observable at the same time that he considered himself as possessing an interest in the soil, exclusive to a certain extent; otherwise why claim a monopoly in his disposal of lands within the charter boundary? He would not

himself take possession without giving an equivalent, but he would not permit others to purchase. This was bringing the *Indian* to his own market, where, if he sells at all, the *Indian* must take what he could get from this his only customer. This was an indirect constraint, and in fact exercising an interest in the soil, an *ownership of it*. It cannot be said therefore that the proprietor admitted an absolute dominion in the *native* to the ownership of the soil. In fact he considered the *Indian* title as but in the nature of a *claim*. Nor was it altogether without reason that he so considered it; not for the reason already hinted at, the not being a *christian*, but for the not being a *man;* in other words, the not living *more humano*, and after the manner of men. For what distinguishes an *Indian* from a wild beast, an animal *feræ naturæ*, who lives upon his prey and cultivates little or no soil? And hence it is that if he claims a right to what soil shall be necessary, living in this manner, it will be more than will fall to his share as one of the family of mankind; for the cultivation of the soil will support a greater population, than a life by hunting, and therefore this mode of life is less according to the law of nature. It is on this principle that the philosopher fastens in reducing the claim of the savage from that extensive range of a life by hunting, to a more confined extent of subsistence by tilling the ground. With regard to the whole of mankind, a savage cannot be said to have an absolute right to the soil he occupies, since he does not occupy it in a way that contributes to the civilization of man; for a close population and the scarcity of soil to a certain extent, are necessary to the improvement of the species. Arts and manufactures are the offspring of a close cohabitation, science also and all those endowments which elevate human nature. Hence cities, towns and dense settlements produce refinement in manners, and lead to the cultivation of literature and to all mental enjoyments. Can those therefore be said to have a perfect right to the soil, who do not use it themselves in a proper manner? Can they be said to have a right to hinder others to use it? I know the extent of this argument, and it is sufficient to open the vista to see where it will lead. It will terminate in this, that with respect to the community of nations, there can be no *absolute* right of soil in any nation, unless where

it can be ascertained that taking quantity and quality into view, and relative contiguity to marine productions, no more of the earth is occupied by one than another, or at least no more than in proportion to their size and the production of what is necessary for their subsistence. For to reduce it to strict principle, as the length and breadth of the place of interment is to the body of a man at death, so is his proportion of the soil during life. But upon this principle in making such allotment, we must consider every portion of soil equally productive, which it is not, or at least made equally capable of subsisting, by the adjoining element of water, fowling or fishing or some such advantage. But though it may not be practicable to ascertain to what portion of any soil the right of an individual may extend in a state of nature, yet the claim of the savage is monstrous, living by hunting and claiming beyond all reasonable extent. I therefore do not respect the claim of a native *Indian* as he is called, in the light of an *absolute* right to the whole extent of the soil he is accustomed to range over, or rather to prowl across in his pursuit of wild beasts. The proprietor did not seem to have considered it in that light, otherwise he could not have thought himself justifiable in restraining others from purchasing this right from the native, should he be disposed to sell. He seems to have considered the native as having something like a lien on it, a *special* property in the whole, but an absolute right only to so much of it, as living by cultivating it, might be necessary for his subsistence. Hence it is that we hear of *extinguishing* the *Indian* title. And it was at all times well understood both by the proprietary and others, that the extinguishing this title was practicable, by an easy purchase from time to time, so as at no distant day to include the whole within the charter boundary. It was little else than a mere matter of form to reserve the *Indian* title in the grants made by the proprietary, though it was usual to make such a reservation "of lands lying within the late purchase made of the In-" dians." Yet on the score of interest in the soil, had not the proprietor *William Penn*, and those under him, the same right to grant before a purchase, as the king of *England* had to grant to him? The proprietor by taking the charter cannot be said not to have acknowledged the right of the king

of *England* to grant; and the charter being taken without any reservation of the rights of the natives, goes some length in implying an idea on the part of the proprietor that they had no right; at least that it was not an absolute right. For with the full knowledge of all the circumstances in his mind, it would be idle to accept as a compensation for services or even as a gratuity, what was of no value. It might be said, it is true, that he accepted the king of *England's* good will to this soil, not regarding it as a title. But the matter of fact is, that in the understanding of both proprietor and settler that came with him, the king's right was considered good, though founded but on the right of discovery; and the savages were considered as but having a *claim*, which more for the sake of peace than of obligation, it behoved them to extinguish.

But as this matter of fact may be disputed, the understanding on the part of the proprietor or those settling under him, let it rest on matter of law; and it cannot be denied to be a principle, that an individual selling that to which he has no right, yet if he after acquires a right, it shall enure to the use of him to whom he sold. Would the proprietor have been bound after having made a purchase of the *Indians*, to complete a title for land sold before a purchase of it from the *Indians?* This will depend upon his having intended to grant the land in question, or the not having used the proper means on his part to ascertain and to know what he was granting. It will not lie in his mouth after having received a valuable consideration, to allege that he was mistaken in his grant, unless the mistake was induced by the purchaser, or the proprietor deceived in his grant. Whose duty was it to measure off the land, and to know what was to be measured off? Whose officer was the surveyor? He has been said to be the agent of both purchaser and proprietor. Could the purchaser change him as he would change an agent? The proprietor could. I consider it just the same thing as if the proprietor himself had been present, and had measured off the land. The boundary of the purchase, in other words, the purchase line, was known to neither of them; but it was in the power of the proprietor to have ascertained it. The purchaser could not, for it would have been at his peril to have entered on the soil of the proprietor and to

have run and marked lines for the purpose of ascertaining the boundary. It would have been unreasonable that he should have been at this expense for the sake of a single tract. It behoved the proprietor to have had the boundary ascertained, before he granted a single warrant or authorized a single survey for the new purchase; because it could not be mathematically known, nor, unless where natural boundaries were called for, could it be certainly known where the land measured off might lie. There was no mistake of the individual spot shewn to the surveyor. The tract to be surveyed was shewn to the officer of the proprietor. There was no fraud on the part of the purchaser; and I view it in the same light, as if a merchant in his shop, meaning to sell to a certain extent of the piece, should cut off a yard beyond, and receive the price and deliver it to the buyer. The making a survey and running lines, and marking beyond the line of the *Indian* purchase, might give umbrage to the *Indians*, and subject the country to a war, as a settlement would do; and it was prohibited by law to make a settlement, and with a view to this policy. But though the legislature by an act could prohibit settlements, being an act operating upon their own citizens, yet they could not prohibit the charter proprietor from surveying and selling the property admitted to be his, and therefore shall not be presumed to have done it, nor the act in question be construed to have gone so far.

I do not think it would have lain in the mouth of the proprietor to say, that not having run the purchase line, he had suffered a survey to be made, which now appeared to be over it, having received the fees of office for surveying, and the purchase money. He would have been compellable in equity to grant a patent, had he not granted it; but having granted it and completed the agreement, 2 *Powell on Contracts* 263 is in point that he was bound by it, where it is the mistake of all the parties to the agreement, and no one is more under an imposition than another. Courts of equity hold that to shake them on that account would be mischievous, tending to make all agreements vain and nugatory; and in such a case the mistake is not the occasion of the promise, therefore the act is valid, there being nothing wanting of the assent or *bona fides*. When in addition to

1813.

THOMPSON
*v.*
JOHNSTON.

1813.

THOMPSON
v.
JOHNSTON.

this it is considered that it more behoved the one party to have prevented the mistake than the other, the case is the stronger. The proprietor could have the line run definitively between him and the *Indians*, according to the sale made by them; the grantee could not. He had not authority even had he gone to the expense; it was a line of forty or fifty miles, and his running might neither have satisfied the proprietor nor the *Indians*. It is admitted by the counsel, and it could not but be admitted, that in chancery the proprietor would have been compelled to *refund the money*. But if the party who could have compelled him to refund had got the land, why not keep it? *Melior est conditio possidentis*. Whatever the proprietor was compellable to abide by, will not the Commonwealth which succeeds to his rights be bound to do? The Commonwealth has succeeded to his estate in these lands. But by the act, that of the 27th of *November* 1779, there is a reservation of all rights, titles, estates, claims and demands which were granted by or derived from the said proprietaries, their officers or others by them duly commissioned, authorized and appointed or otherwise, or to which any person or persons other than the said proprietaries were or are entitled, either in law or equity, by virtue of any deed, patent, warrant or survey, of, in or to any part or portion of the lands comprised or contained within the limits of this state, &c. or by virtue of any location, &c. Could there be any thing more extensive than such a reservation? " Officers " duly appointed or *otherwise*." They were willing to embrace every possible equity that could be in any party, claiming from by or under the proprietor. And when it is considered that it was an exercise of the *dominium eminens*, as the civilians term it, or transcendental right, as *Burlamaqui* calls it, a divesting property on the ground of the *salus populi, the supreme law*, shall we be putting a hard construction on the law as affecting third persons, and applying the rule of the *summum jus?* Even had the proprietors themselves been concerned, it cannot be alleged that they could now be called upon to refund, since they have made no objections to the grant, but affirmed it by a *patent* so early as *February* 1775. Or would it be reasonable to turn the purchaser round to recur to them?

The Commonwealth has made no offer to refund the purchase money with interest, even if this could divest the right of the purchasers. I have never met with any thing that has appeared to me a clearer case both of equity and law. Let me consider it a little more. The proprietary estate was taken away on the ground of being too enormously great, to be consistent with the freedom of a republican government, which cannot endure such inequality of possessions in an individual. This was a principal consideration, setting aside socage render and quit rents, which were a badge of the ancient tenures under great lords in *England;* but the chief argument urged, was the inequality of the possession. Now an adequate or equivalent compensation would be inconsistent with the taking away, for in that case the inequality would still exist in another shape. The 130,000*l.* was not therefore a compensation in value, but something in consideration of what had been taken away; a sum which the proprietary family might be suffered to retain, as not inconsistent with the individual freedom of the community. It was nevertheless thought a hard case, and the legislature themselves did so consider it; for as to claims derived under the proprietor, they have been manifestly liberal in their provisions and reservations. They had no idea of looking at the circumstance of a survey being made by a surveyor out of his district, or not duly commissioned, or made on land in one county when the warrant called for another, or whether the dividing line of a purchase from the *Indian* territory ran through it or left it out. They confirmed all these things in bulk, lands surveyed or grants made in a course of a regular proceeding of the land office or *otherwise.* But even were not this act to be considered as a species of confiscation which is not favoured by our laws, all forfeitures being odious, and supposing the succession by the Commonwealth to be as *heir,* and free from all odium of taking property under the idea of an imperious necessity, yet even in *England* where the heir is so much favoured by the common law, would he not be compelled even under an equitable agreement of his ancestor, to complete it under such circumstances? Land not at market, but by the mistake of supposing it at market measured off, possession taken, and the usual rent stipulated, or what is

more, advanced, or what is stronger, the usual whole value or selling price of lands paid. What reason have we to suppose that the lord of the soil in question, the proprietor, would have demanded more for this land than for lands before sold, the 5*l.* sterling an hundred acres? For what an heir may be called upon in *England* to do, I will cite an authority or two. " The heir of a person who has entered into " a contract, may in equity be liable to perform it although " he is not named in it. For where a person articled for the " sale of lands which he convenanted to convey, but did not " covenant for him and his heirs, it was held that his heirs " should be bound to perform the agreement. *New. on Con.* " 34. If *A* agree to sell lands and receive part of the purchase " money, and before any conveyance made die, his heir on a " bill brought against him will be decreed to convey." *Com. on Con.* 115. But it will be said this is not the case of an ancestor or heir claiming the lands, but of a third party, a *bona fide* purchaser of the lands before granted by the ancestor through mistake. He may be a *bona fide*, but is he what the law calls an *innocent* purchaser? Had he not notice? The survey on the ground was notice; the survey was returned into the office and a patent granted. It was matter of evident notoriety in *pais*, to all the country, that these surveys had been made; and when the division line of the purchase came to be run, it cut some of them in two, or left but a selvage in the old purchase, or threw them out altogether. It was a catch at this circumstance that led to the application of the plaintiff for a warrant, and to survey across these lines. But had the contract with the proprietor even been void, I can cite an authority that will shew, that a third person cannot take advantage of it where a consideration has been paid. If a person lends money on a surrender of copyhold lands, but which is not presented at the next Court, for want whereof it is void by the custom of the manor, and afterwards another person purchases the same land from the mortgagor with notice of the prior surrender, and takes a surrender and is admitted thereon, the Court will decree the subsequent purchaser either to pay the mortgagee his money, or to surrender him the legal estate. *New. on Con.* 505. There is but one single particle of equity in this case, as between the proprietary grantee

and the Commonwealth or the plaintiff deriving title under it. It might be said, that though the proprietor might have been considered bound to extinguish the *Indian* title because he sold at the usual selling price of lands for which the *Indian* title was extinguished, yet as he had not done it before it was put out of his power to do it by the Commonwealth taking the estate from him, yet the Commonwealth having at a subsequent treaty with the *Indians* made a purchase, the defendant may be said to be bound to contribute a *blanket* or *a pair of leggens* as his proportion of the extinguishment. That I presume he would have no objection to do, or the value of them if called upon for it, but deducting at the same time his proportion of the tax which in contemplation of law, we must presume has been raised towards this extinguishment. This is taking up matters in the extremest rigour which the law could require. But under all circumstances I take the defendant to have the ground valid under him, notwithstanding the proprietor had cut from a piece of cloth, so to speak, which he meant to have kept a while by him, and not to have disposed of at that time; and this is all that can be said about it. Both buyer and seller mistook the piece; both are contented, but a third person who knew all this, wishes to avail himself of the mistake. I will not sanction it, or so far as my opinion goes, suffer it to be done.