In the Matter of: OPENING a PRIVATE ROAD FOR the BENEFIT OF Timothy P. O'REILLY Over Lands of (a) Hickory on the Green Homeowners Association, and (b) Mary Lou Sorbara; Gregory E. Burgunder; Ann E. Cain; Don E. Cottrill & Norma J. Cottrill, h/w; Joseph K. Cupples; Bart V. Delcimmuto; James D. Dragoo & Linda J. Dragoo, h/w; Kimberly M. Fonzi; Brian J. Gallagher & Diane J. Gallagher, h/w; Dolores M. Gembarosky; Michael J. Gralish, Jr. & Virginia A. Gralish, h/w; Diane M. Giuliana; Jeffery W. Hutchens; David B. Keith & Christina A. Keith, h/w; Joanne B. Kuchinic, Testamentary Trust; Harry J. Lee, Jr.; Jay A. Levy; S. Greg Malone; Joseph V. Mazur & Kelly L. Poole; Martin Mickey & Melissa G. Mickey, h/w; Regis G. Niederberger & Kathleen C. Niederberger, h/w; Gordon J. Orr; Anne M. Paul; Thomas G. Porter; Roseanne E. Petraglia; Eric H. Rittenhouse & Danielle L. Rittenhouse, h/w; John J. Sahlaney; Jerome Schmier & Carol Falo, h/w; John R. Shafer, Trustee or his Successors in trust, under the John S. Shafer Living Trust, dated November 20, 2001, and Jessie M. Shafer, Trustee, or her successors in trust, under the Jessie M. Shafer Living Trust, dated November 20, 2001; Marcus A. Spatafore & Kristin C. 1 Brazell; William E. Sprecher & Marcellene Sprecher,

---

h/w; and Frank J. Sprecher & Agnes E. Sprecher, h/w, Life Estate; Roxanne M. Squillante; Susan C. Stanko; Shanan R. Stewart; Richard H. Sweet & Marsha A. Sweet, h/w; Gregory Taylor; John M. Thomas; Thomas P. Wakim & Kimberly L. Wakim, h/w; Betty B. Williams & Leon I. Williams (Co–Trustees); Royce D. Vanderpool; Melissa J. Schiller & Melanie M. Schiller; Janet Zewe; Frank A. Bodnar; Karen R. Billingham; Bradford R. Jones; Virginia L. Knaus, Trustee Under Qualified Personal Residence Trust Agreement, dated July 27, 2000; Joan L. Massella; Donna Durkan; Geraldine R. Altenhof; Elizabeth Beck; Darlene A. Taylor; James E. Spence & Kathy F. Spence, h/w; Lance D. Moller; Lindy M. McGee; The Judith F. Koblitz Trust; Richard E. McNutt & Helena A. McNutt, h/w; Dorothy D. Wagner; Spitzig Living Trust and William A. Spitzig and Marilyn J. Spitzig (Trustees); Sandra H. O'Connell; Thomas C. Skena; Zaraf Moshin; Paul W. Amic & Carole L. Amic, h/w; Margaret M. Showalter; James P. Flannery & Patricia C. Flannery, h/w; Deborah A. Gertz; Carol L. Schartner; John A. Udischas & Susan C. Udischas, h/w; Donna M. Bartko; Kyli J. Martin; Robert J. Grimm & Jana L. Phillis; Amy R. Solomon; Richard M. Buck & Barbara L. Buck, h/w; Arlene Lipton; William G. Eiler; Catherine M. Smith; Dawna M. Maydak; Mildred K. Fincke; Margaret M. Cornellius; Craig M. Drinkhall; Randi Burdick; Robert F. Milligan, Jr. & Marilyn R. Milligan, h/w; Ronald G. Bauer & Teresa L. Bauer, h/w; Anna Marie Cimarolli; Jor R. Palmer & Ann D. Palmer, h/w; John William Minnich; Joseph J. Astorino & Marilyn J. Astorino, h/w; Thomas S. Phillips; Catherine E. Tsai; Naomi H. Patton; Stanley A. Hack & Christine E. Hack, h/w; Michael L. Hynes & Janice M. Hynes, h/w; Thomas E. Darabant & Faye C. Floriani; William J. Garrity, Sr. & Patricia Ann Garrity, h/w; Archie L. McIntyre; Clarence Joseph Welter & Mara Welter, h/w; Lisbeth A. Dineen; Charles W. Fetrow & Margaret A. Fetrow, h/w; Kathleen Lyon; Mark A. Petrozza & Dorothy M. Petrozza, h/w; John R. Zecchino, as their interest may appear,

Timothy P. O'Reilly

v.

(a) Hickory on the Green Homeowners Association, and (b) Mary Lou Sorbara; Gregory E. Burgunder; Ann E. Cain; Don E. Cottrill & Norma J. Cottrill, h/w; Joseph K. Cupples; Bart V. Delcimmuto; James D. Dragoo & Linda J. Dragoo, h/w; Kimberly M. Fonzi; Brian J. Gallagher & Diane J. Gallagher, h/w; Dolores M. Gembarosky; Michael J. Gralish, Jr. & Virginia A. Gralish, h/w; Diane M. Giuliana; Jeffery W. Hutchens; David B. Keith & Christina A. Keith, h/w; Joanne B. Kuchinic, Testamentary Trust; Harry J. Lee, Jr.; Jay A. Levy; S. Greg Malone; Joseph V. Mazur & Kelly L. Poole; Martin Mickey & Melissa G. Mickey, h/w; Regis G. Niederberger & Kathleen C. Niederberger, h/w; Gordon J. Orr; Anne M. Paul; Thomas G. Porter; Roseanne E. Petraglio; Eric H. Rittenhouse & Danielle L. Rittenhouse, h/w; John J. Sahlaney; Jerome Schmier & Carol Falo, h/w; John R. Shafer, Trustee or His successors in trust, under the John S. Shafer Living Trust, dated November 20, 2001, and Jessie M. Shafer, Trustee or her successors in trust, under the Jessie M. Shafer Living Trust, dated

November 20, 2001; Marcus A Spatafore & Kristin C. Brazell; William E. Sprecher & Marcellene Sprecher h/w; and Frank J. Sprecher & Agnes E. Sprecher, h/w, Life Estate; Roxanne M. Squillante; Susan C. Stanko; Shanan R. Stewart; Richard H. Sweet & Marsha A. Sweet, h/w; Gregory Taylor; John M. Thomas; Thomas P. Wakim & Kimberly L. Wakim, h/w; Betty B. Williams & Leon I. Williams (Co–Trustees); Royce D. Vanderpool; Melissa J. Schiller & Melanie M. Schiller; Janet Zewe; Frank A. Bodnar; Karen R. Billingham; Bradford R. Jones; Virginia L. Knaus, Trustee Under Qualified Personal Residence Trust Agreement dated July 27, 2000; Joan L. Massella; Donna Durkan; Geraldine R. Altenhof; Elizabeth Beck; Darlene A. Taylor; James E. Spence & Kathy F. Spence, h/w; Lance D. Moller; Lindy M. McGee; The Judith F. Koblitz Trust; Richard E. McNutt & Helena A. McNutt, h/w; Dorothy D. Wagner; Spitzig Living Trust; Sandra H. O'Connell Thomas C. Skena; Zaraf Moshin; Paul W. Amic & Carole L. Amic, h/w; Margaret M. Showalter; James P. Flannery & Patricia C. Flannery, h/w; Deborah A. Gertz; Carol L. Schartner; John A. Udischas & Susan C. Udischas, h/w; Donna M. Bartko; Kyli J. Martin; Robert J. Grimm & Jana L. Phillis; Amy R. Solomon; Richard M. Buck & Barbara L. Buck, h/w; Arlene Liton; William G. Eiler; Catherine M. Smith; Dawna M. Maydak; Mildred K. Fincke; Margaret M. Cornellius; Craig M. Drinkhall; Randi Burdick; Robert F. Milligan, Jr. & Marilyn R. Milligan, h/w; Ronald G. Bauer & Teresa L. Bauer, h/w; Anna Marie Cimarolli; Jor R. Palmer & Ann D. Palmer, h/w; John William Minnich; Joseph J. Astorino & Marilyn J. Astorino, h/w; Thomas S. Phillips; Catherine E. Tsai; Naomi H. Patton; Stanley A. Hack & Christine E. Hack, h/w; Michael L. Hynes & Janice M. Hynes, h/w; Thomas E. Darabant & Faye C. Floriani; William J. Garrity, Sr. & Patricia Ann Garrity, h/w; Archie L. McIntyre; Clarence Joseph Welter & Mara Welter, h/w; Lisbeth A. Dineen; Charles W. Fetrow & Margaret A. Fetrow, h/w; Kathleen Lyon; Mark A. Petrozza & Dorothy M. Petrozza, h/w; John R. Zecchino, as their interest may appear, Appellants.

Commonwealth Court of Pennsylvania.

Argued May 7, 2008.
Decided July 11, 2008.

McGinley, J., did not participate in the decision of this case.

Smith–Ribner, J., dissented and filed opinion.

Kevin P. Allen, Pittsburgh, for appellants.

William P. Bresnahan, Pittsburgh, for appellee.

BEFORE: LEADBETTER, President Judge, and SMITH–RIBNER, Judge, PELLEGRINI, Judge, FRIEDMAN, Judge, COHN JUBELIRER, Judge, SIMPSON, Judge, and LEAVITT, Judge.

OPINION BY Judge PELLEGRINI.

Though the "Private Road Act"[1] was first enacted in colonial times, Hickory on the Green Homeowners Association, along with its 124 constituent property owners (collectively, "Association") contends that the Private Road Act is an unconstitutional taking of property for a private purpose in violation of the Fifth Amendment to the United States Constitution[2] and Article 1, §§ 1[3] and 10[4] of Pennsylvania's Constitution. They raised this challenge in preliminary objections to Timothy P. O'Reilly's (O'Reilly) request for the Appointment of a Board of Viewers to open a private road so that landlocked parcels he owns could have access to the nearest public road, Clubview Drive. The

---

1. Act of June 13, 1836, P.L. 551, *as amended*, 36 P.S. §§ 1781–2891.

2. The Fifth Amendment to the United States Constitution provides, in relevant part: [N]or shall private property be taken for public use, without just compensation. U.S. Const. Amend. V.

3. Article I, Section 1 of the Pennsylvania Constitution, Pa. Const. Art. I, § 1 provides:

    All men are born equally free and independent, and have certain inherent and independent

feasible rights, among which are those of enjoying and defending life and liberty, of acquiring, possessing and protecting property and reputation, and of pursuing their own happiness.

4. Article I, Section 10 of the Pennsylvania Constitution, Pa. Const. Art. I, § 10 provides, in relevant part:

    [N]or shall private property be taken or applied to public use, without authority of law and without just compensation being first made or secured.

proposed private road would cross the Association's property and that of Mary Lou Sorbara, the owner of property adjacent to the eastern boundary of the Association's property. The trial court overruled the preliminary objections finding that the Private Road Act was constitutional under well-settled law and that, while there was a private benefit, the public benefited by allowing the public road because it was not in the public interest to have land that could not be used. Because of its public importance, we agreed to hear this interlocutory appeal[5] from the trial court order.[6]

## I.

The constitutionality of the Private Road Act had been considered settled because various cases of our Supreme Court held that the laying out of a private road over the property of another so that landlocked property could have access to a public road did not violate the takings provisions of the Pennsylvania Constitution. For example, in *Waddell's Appeal*, 84 Pa. 90, 93–94 (1877), our Supreme Court stated:

> The right of the legislature to establish private roads over the land of one man for the benefit of another, for the purpose of access to highways or places of necessary public resort, or even to private ways leading to highways, has never been seriously doubted in Pennsylvania.... [I]t is the connection of these

private ways with public highways, or with places of necessary public resort, together with the implied right or license of the public to use them, at least in going to and from the premises of the person laying them out, quite as much, if not more, as the consideration of purely individual rights, that have won for these acts judicial recognition of constitutionality.

*See also Palairet's Appeal*, 67 Pa. 479 (1871); *Pocopson Road*, 16 Pa. 15 (1851); *In re Private Road in East Rockhill Twp., Bucks County, Pa.*, 165 Pa.Cmwlth. 240, 645 A.2d 313 (1994); *T.L.C. Services, Inc. v. Kamin*, 162 Pa.Cmwlth. 547, 639 A.2d 926 (1994); *In re Dickinson Township Road*, 23 Pa. Superior Ct. 34 (1903). Similarly, the single federal case that challenged the constitutionality of the Private Road Act found that it did not violate the Takings Clause of the Fifth Amendment to the United States Constitution. *See Marinclin v. Urling*, 262 F.Supp. 733 (W.D.Pa.1967), *affirmed*, 384 F.2d 872 (3d Cir.1967).

There has been, however, a renewed interest in what constitutes a public purpose allowing a condemning authority to take private property by eminent domain as a result of the United States Supreme Court decision in *Kelo v. City of New London*, 545 U.S. 469, 125 S.Ct. 2655, 162 L.Ed.2d 439 (2005). In that decision, the

---

**5.** On November 9, 2007, the trial court amended the order to include a statement pursuant to Section 702(b) of the Judicial Code, 42 Pa.C.S. § 702(b), that the October 26, 2007 order involved controlling questions of law as to which there was substantial ground for difference of opinion and that an immediate appeal could materially advance the ultimate termination of that matter. By order dated December 26, 2007, this Court granted the Association's petition for permission to appeal the trial court order of October 26, 2007, as amended.

**6.** In reviewing a decision of a lower court on preliminary objections, we consider a pure question of law and our standard of review is plenary. *Hospital Healthsystem Association of Pennsylvania v. Department of Public Welfare*, 585 Pa. 106, 888 A.2d 601 (2005). In ruling on preliminary objections, a court must accept as true all well-pleaded material allegations in the petition for review, as well as all inferences reasonably deduced from them. *Envirotest Partners v. Department of Transportation*, 664 A.2d 208 (Pa.Cmwlth.1995).

United States Supreme Court "embraced a broader and more natural interpretation of public use as 'public purpose'" allowing the taking of land to give to a private developer because the taking fostered the "public purpose" of economic development. *Id.* at 480, 125 S.Ct. 2655. It also stated that when reviewing a takings analysis, "great respect" had to be given to state legislatures and state courts to discern local public needs. *Id.* at 482, 125 S.Ct. 2655. While it also stated that a taking of land would be clearly forbidden for the sole purpose of conferring a private benefit on a private party, the reaction to the case caused various states, including Pennsylvania, to enact legislation limiting the taking of private property for private enterprise by placing restrictions on the exercise of eminent domain. *See* Property Rights Protection Act, 26 Pa.C.S. §§ 201–207.

Our Supreme Court also recently addressed the taking of property for private purposes. In *Middletown Township v. Lands of Stone*, 595 Pa. 607, 617, 939 A.2d 331, 337–338 (2007), the Court stated:

> According to our Court, "a taking will be seen as having a public purpose only where the public is to be the primary and paramount beneficiary of its exercise." *In re Bruce Ave.*, 438 Pa. 498, 266 A.2d 96, 99 (1970). In considering whether a primary public purpose was properly invoked, this Court has looked for the "real or fundamental purpose" behind a taking. *Belovsky v. Redevelopment Authority*, 357 Pa. 329, 54 A.2d 277, 283 (1947). Stated otherwise, the **true** purpose must primarily benefit the public.
>
> * * *
>
> This means that the government is not free to give mere lip service to its authorized purpose or to act precipitously and offer retroactive justification. In *School District of Pittsburgh*, 430 Pa.

566, 244 A.2d 42, 46 (1968), this Court held that "[u]nless the property is acquired for an authorized public use, and after a suitable investigation leading to an intelligent, informed judgment by the condemnor, the condemnation is invalid." (Emphasis in original.)

While *Lands of Stone* reiterated that it was the public that had to primarily benefit from the taking, the case that raised serious doubts about the constitutionality of the Private Road Act was *In re Forrester*, 575 Pa. 365, 836 A.2d 102 (2003). In *Forrester*, our Supreme Court in a plurality decision stated that the taking of a private road conferred no public benefit, but only a benefit to the person who was requesting the private road. *Id.* Before addressing *Forrester*, however, it is necessary to give some background regarding the Private Road Act and its origins.

## II.

### A.

The present version of the Private Road Act was enacted in 1836. It provides that a landlocked property owner(s) can request the court of common pleas in which the property is located for the appointment of viewers to place a private road so that the owner's property may be accessible to a public highway or to any private way leading to a highway. Section 11 of the Private Road Act, 36 P.S. § 2731. After viewing the property, the viewers are to determine if the private road is necessary, and if it is, they are required to lay out the road considering the shortest distance, the best ground for the road and a route that does the least injury to private property, all while taking into consideration the desires of those seeking the private road. Section 2 of the Private Road Act, 36 P.S. § 1785.

Damages sustained by the owners of the land are calculated in the same way as if the road being opened is a public road. Section 2 of the Private Road Act, 36 P.S. § 2736. Others may petition to use the private road once the trial court determines what sum the person should contribute to those who opened the private road and what additional compensation to the owner of the land on which the private road is located. Section 17 of the Private Road Act, 36 P.S. § 2761.

While this version of the Private Road Act was enacted in 1836, the original version was enacted in 1735 when Pennsylvania was still a province and controlled by the heirs of William Penn. In that year, the Provincial Legislature enacted legislation authorizing the laying out of roads at the request of private individuals to access public roads, finding that the lack of access was not only burdensome to the person who desired the private road, but to the public as well.[7] Act of February 20, 1735 (recorded in Statutes at Large of Pennsylvania From 1682–1801, Vol. 4 (1724–1744) (Statutes at Large), pp. 296–297). After independence from England and the adoption of the Pennsylvania Constitution of 1790, the General Assembly adopted a part of a statute of a similar private road provision providing for private roads. *See* Act of April 6, 1802 (recorded in Laws of the Commonwealth of Pennsylvania 1700–1810, Vol. III, pp. 512–524).

### B.

Article IX, § X of the 1790 Constitution required that for a condemning authority to take property, the owner of the property had to consent to the taking providing that "nor shall any man's property be taken or applied to public use *without the consent of his representatives* and without just compensation being made."[8] (Emphasis added.) If viewed through the lens of traditional takings law, then the 1802 and 1836 versions of the Private Road Act, allowing the laying of our private roads without consent of those whose lands the private roads traversed, would appear to violate this provision of the Pennsylvania Constitution. Taking for a private road without consent of the property owner is even more perplexing when the Private Road Act's lack of consent is compared with the Pennsylvania Mills Act enacted in 1803.[9]

---

7. The Act of February 20, 1735, states, in relevant part:

   [I]f any part of such road, although the same be laid out for the convenience of one or but few persons, shall happen to be laid out through the improved ground of any person, the said improved ground is to be valued as by the said act is directed and paid for out of the county stock, *which parts of said law have, since the great increase of our inhabitants, been found to be very inconvenient and burdensome as well to the public as to private persons*[.] (Emphasis added.)

8. This provision was renumbered in 1874 as Art. 1, § X and amended to take out the requirement that the consent of a land owner had to be obtained for a taking of property. No change was made to this section until it was amended again in 1968 to read: "[n]or shall private property be taken or applied to public use, without authority and without just compensation being first made or secured." In 1973, the Article was amended with the words "of law" which were inserted after "authority," so it read: "[n]or shall private property be taken or applied to public use, without *authority of law* and without just compensation being first made or secured."

9. "An Act to authorize any person or persons owning lands adjoining navigable streams of water, declared public highways, to erect dams upon such streams, for mills and other water works" (Mar. 23, 1803). Reprinted in John W. Purdon, A Digest of the Laws of Pennsylvania, 1700–1830, at 645 (1831). Connecticut, Delaware, Maryland, Massachusetts, New Hampshire, North Carolina, Pennsylvania, Rhode Island, South Carolina and Virginia also had Mills Acts.

The Pennsylvania Mills Act authorized riparian landowners to construct dams and flood lands of upstream property to build up heads of water necessary for the operation of grain and saw mills. The first Mills Act was enacted by Virginia in 1667, but a form of the Mills Act was eventually adopted by the majority of states. *Head v. Amoskeag Manufacturing Co.*, 113 U.S. 9, 5 S.Ct. 441, 28 L.Ed. 889 (1885).[10] As a rule, the Mills Act limited the compensation from that mill and prevented aggrieved riparians from pursuing the common law remedies of injunctive relief or self-help. In essence, the Mills Act delegated the power of eminent domain to private landowners and permitted them effectively to condemn for their own uses land that, as Delaware's assembly put it, "may happen to be another Man's Property."[11] *See also Kelo*, 545 U.S. at 480, n. 8, 125 S.Ct. 2655 ("From upholding the Mills Act (which authorized manufacturers dependent on power-producing dams to flood upstream lands in exchange for just compensation), to approving takings necessary for the economic development of the West through mining and irrigation, many state courts either circumvented the 'use by the public' test when necessary or abandoned it completely.")

In contrast to other states, the Pennsylvania Mills Act, while allowing a riparian owner to dam the waters of the stream, did not allow the taking of private property to construct a dam head without that owner's consent. Recognizing that the extant provisions of the Pennsylvania Constitution prohibited such a taking, it provided that "the person or persons so erecting said dam or dams shall not infringe on or injure the rights and privileges of the owner or possessor of any private property on such stream." Pennsylvania Mills Act § 1. If the Pennsylvania General Assembly recognized those constitutional provisions that property could not be taken without the consent of the property owner in the Pennsylvania Mills Act enacted in 1803, the question is why it did not place a similar provision in the Private Road Act enacted in 1802. The answer to that question appears to go back to William Penn's Charter from King Charles II of England, in which "concessions" were made to earlier purchasers of land and later amended to include, among other things, how roads and highways were to be laid out.

### C.

By the Royal Charter of March 4, 1681, King Charles II of England granted "William Penn, his heirs and assigns ... make, create and constitute the true and absolute proprietaries of the Contrey [Pennsylvania]" conveying to him "an immediate and absolute estate in fee to the province of Pennsylvania." *Thompson v. Johnston*, 6 Binn. 68, 70 (Pa.1813). To encourage in-

---

**10.** A comprehensive list of the various state Mills Acts in effect between 1667 and 1885 is set forth in *Head v. Amoskeag Manufacturing Co.*, 113 U.S. 9, 17, n. 2, 5 S.Ct. 441, 28 L.Ed. 889 (1885).

**11.** Delaware's Mills Act, reprinted in Cushing's Delaware Laws. Some statutes justified the taking as being for a public purpose because mills were required by law to grind the grain of all citizens. North Carolina designated such mills as "Public Mills," and required their owners to "grind Wheat and Indian Corn for all such Persons as shall re-

quire the same...." *See* An Act, to encourage the Building of Mills (Jan. 19, 1715), reprinted in 1 Cushing's North Carolina Laws. Rhode Island similarly recognized the duty of "all Millers, and Persons tending Mills" to "make good Meal, according to custom, and grind for each Person bringing Corn or Grain to be ground, in their turn, without Distinction...." *See* "An act for regulating Water–Mills" (1734) in The Public Laws of the State of Rhode–Island and Providence Plantations 374 (1822).

vestors and settlers, on July 11, 1681, William Penn issued what can best be described as a prospectus, setting forth "Certain Conditions or Concessions agreed upon by William Penn, Proprietary and Governor of the Province of Pennsylvania, and those who are Adventurers and Purchasers in the Same Province...." The First Paragraph of that document dealt with laying out cities and roads and provided:

That so soon as it pleaseth God that the abovesaid persons (the proprietary and adventurers and purchasers in the province) arrive there, a certain quantity of land or ground plot shall be laid out for a large town or city, in the most convenient place upon the river for health and navigation, and every purchaser and adventurer shall by lot, have so much land therein, as will answer to the proportion which he hath bought or taken up upon rent; but it is to be noted, that the surveyors shall consider what roads or highways will be necessary to the cities, towns, or through the lands. *Great roads from city to city, not to contain less that forty feet in breadth, shall be first laid out, and declared to be for highways, before the dividend of acres be laid out for the purchaser;* and the like observation to be had for the streets in the towns and cities, that there may be convenient roads and streets preserved, not to be encroached upon by any planter or builder, that none may build irregularly to the damage of another. In this custom governs. (Emphasis added.)

The roads and streets were to be laid out of the proprietor's lands—William Penn's land—and not counted against the land bought by the purchaser. While the streets were laid out for Philadelphia, it was difficult to lay out streets or roads in other towns or between towns because Philadelphia was the only planned town.

Recognizing that method prescribing in the "concessions" to "adventurers and purchasers" that the proprietor lay out roads was impractical, in 1700, the Provincial Legislature enacted an "Act for the effectual establishment and confirmation of the Freeholders of the Province, their heirs and assigns, in their lands and tenements" to correct "many great neglects and errors [that] have been committed through the want of experience and neglect" in "the first laying out and setting of lands in the Providence of Pennsylvania and Territories...:" Under this Act, rather than have the proprietor lay out the roads to where there may not be a future settlement, it was agreed that every purchaser of land would be given an additional six percent of land free of charge for public roads as they became necessary. "For this addition quantity of land, the grantee never paid any price, nor rent: It was not even subject to taxation." *Breckbill v. Lancaster Turnpike Company,* 3 Dall. 496, 499, 1 L.Ed. 694 (Pa.1799). From that time forward, warrants for grants of land contained an additional six percent allowance for the establishment of roads or highways.[12] After the passage of this Act,

---

12. In *M'Clenachan v. Curwin,* 6 Binn. 509, 512–13, 3 Yeates 362, 372 (Pa.1802), our Supreme Court explained what occurred as follows:

By this instrument dated 11th *July* 1681, it was agreed that when the adventurers should arrive here, a certain quantity of land, or ground-plat, should be laid out for a large town or city, upon the river *Delaware;* that every purchaser should by lot have so much land therein as would answer to the proportion which he had bought in the country. But previously to laying the dividends for each purchaser, it was directed, that the surveyor should lay out the *great roads* from city to city, or to great towns, as well as the streets in the great towns or cities. The grounds to be occu-

all warrants contained an additional six percent of land. When the proprietorship ended in 1779, the Commonwealth assumed the remaining lands of the proprietorship and the state continued to add to land warrants the additional six percent for roads and highways. Section 6 of the Public Lands Act, Act of December 21, 1784, 2 Sm.L. 272, 64 P.S. § 91.[13]

### D.

The question then is what *types* of roads were to come out of the six percent given to all landowners by the proprietor or the Commonwealth. We have a tendency to view the Private Road Act as a means of correction of prior conveyancing errors or faulty subdivision plans which failed to take into consideration the need to allow access to and from adjoining properties. Part of the reason for that understanding is that we call the provisions allowing for the laying out of a private road the Private Road Act, when that is a misnomer. No matter what version, the 1735, 1802 or 1836 Private Road Act were not stand-alone acts, but were enacted as part of a comprehensive scheme laying out the road system of the Commonwealth.

When warrants were granted for land in the wilderness, those grants of land were up against each other with no public or private roads. To provide access, a system of roads had to be established. As mentioned previously, the first Act authorizing the establishment of private roads was enacted in 1735 as a "Supplement to the Law for Laying Out of Highways and Public Roads" Act of February 20, 1735, (recorded in Statutes at Large of Pennsylvania From 1682–1801, Vol. 4 (1724–1744) (Statutes at Large, pp. 296–297)). This Statute supplements an earlier Act of Assembly, dated November 27, 1700, Chapter 55, titled, "An Act for the Erecting of Bridges and Maintaining Highways."[14]

pied by these great roads and streets, were evidently to be out of the proprietor's lands alone. On the arrival of the adventurers in this country, it was found very practicable to lay out streets in one great city, which was accordingly done; but quite impracticable to lay out the great roads or highways from city to city, as only one city was then contemplated. But as such great roads were to be laid out over the land of the proprietor alone, and the purchasers were not to contribute, it was at length agreed and sanctioned by the early laws of the province, that in lieu of the impracticable plan settled in *England,* there should be an additional quantity of land granted to each purchaser without price or rent, to enable him to contribute without loss to such public roads as should thereafter be found necessary for the use of the inhabitants. In this plan there was evidently a chance that the purchaser might be either a gainer or loser in the event, as it was then, and would probably continue for a long time, uncertain, how much of each man's land would be found necessary for such public roads. (Emphasis in Original.)

**13.** 64 P.S. § 91 provided, in relevant part:

From and after the first day of May next, [1785] and not sooner, the land office of this commonwealth shall be opened for applications for the lands within the purchase made or to be made by the commissioners aforesaid, (the lands within this state appropriated for the redemption of depreciation certificates, and the donation lands to the officers and soldiers of the Pennsylvania line, only excepted,) at and after the rate of thirty pounds for every hundred acres of the same, and so in proportion for greater or less quantities thereof; such application, or the survey thereof to be made, not to exceed one thousand acres, **with the usual allowance of six per centum for highways.** (Emphasis added.)

**14.** The Act included a method to open such roads, providing:

[U]pon the application of any person or persons to the justices of the general quarter sessions of the peace for a road to be laid out from or to the plantation or dwelling-place of any person or persons to or from the highway, the said justices shall and they are hereby empowered to order

The Act begins with the pronouncement: "For the greater convenience and ease of traveling in and through this province and counties annexed," and goes on to require the building of bridges through the "[p]rovince and [t]erritories" and the removal of trees, stumps and other encumbrances in order to clear a path for both horse and cart. That Act treats the opening of roads for private and public persons identically, stating that the increase in population has been burdensome to both public and private persons, thus necessitating legislation to remedy the situation for an overall public purpose. It also provides that the County shall pay for the damages to improved ground[15] for a private road, stating:

> and direct a view of the place where the road is requested to be laid, and return thereof to be made in the same manner as by the before-mentioned act of assembly is directed and appointed: and if a road shall be found necessary, the said justices shall further order and appoint of what breadth the said road shall be, so as the same exceed not thirty-three feet.
>
> Section II of the Act of February 20, 1735, required that any road or cartway laid out would then be used as a common road or cartway for the use and convenience of the persons that petitioned for the road and "for the use and conveniency of all such as shall have occasion to travel to and from the plantations or dwellings of such persons upon whose application the same road was laid out[.]" This section also required that the road "shall be cleared and maintained by the persons using the same to and from their respective dwellings," and demanded that the person or persons, "at whose request and for whose use" the road was laid out, must pay the person whose improved ground is present on the proposed road the value of the land. This statute contains elements similar to the current statutory framework of the Private Road Act, including the ability of a private individual to petition for the opening of a road for the sake of convenience of traveling to and from a dwelling and the requirement that the petitioner of a private road pay dam-

[I]f any part of such road, although the same be laid out for the conveniency of one or but few persons, shall happen to be laid out through the *improved ground* of any person, the said improved ground is to be valued as by the said act is directed and *paid for out of the county stock*[.] (Emphasis added.)

After independence, authorization of private roads was part of a law that the General Assembly enacted creating the road system for Pennsylvania. It was entitled, "An Act for laying out, making and keeping in repair, the public roads and highways within this commonwealth, and for laying out private roads," which contained 25 sections with only three dealing specifically with the laying out of private roads.[16] No longer, though, was the coun-

ages to the person whose land is effected by the proposed road.

15. "In our acts of Assembly, as in common parlance, there is a difference between an improvement and a settlement. An improvement may be made by clearing land and cultivating it without residing upon it. A settlement requires an actual residence." *Bixler v. Baker*, 4 Binn. 213, 218 (Pa.1811). Claims under improvements may be classed among the imperfect rights to land. *Howard v. Pollock*, 1 Yeates 509 (Pa.1795); *Wood v. Jones*, 7 Pa. 478, 1848 WL 5413 (1848). "An improvement is said to be, where anything is done on vacant land, unaccompanied by residence," *Zubler v. Schrack*, 46 Pa. 67, 3 Grant 364 (1863), citing *Howard v. Pollock*, 1 Yeates 509, 512 (Pa.1795).

16. The Act of April 6, 1802, provided a more specific description of the circumstances in which a private road could be created. First, the Act of April 6, 1802, stated that "upon application, by petition, of any person or persons to or from the public highway, or to any place of necessary public resort, the aforesaid justices shall, in open court, and not otherwise, order and direct a view of the place where the road is requested to be laid out...." Next, the Act of April 6, 1802, required that once the road was found to be necessary, the Justices of the Court of Quarter Sessions, "shall further order and direct of

ty required to pay costs incurred with laying out the road, but costs were covered by those who requested the laying out of the private road. Enacted in 1836, the present version of what we commonly refer to as the Private Road Act was, again, part of a general law related to "An Act relating to roads, highways, and bridges" and whose provisions still survive in the Highway Laws of the Commonwealth.

What can be seen from all these Acts is that private roads were considered part of the integrated road system of Pennsylvania that was necessary to gain access to lands given by warrant by the proprietors or by the Commonwealth.[17]

### E.

The effect of all these provisions and the granting of the six percent for roads on takings law were fully explained by our Supreme Court in 1802 in *M'Clenachan v. Curwen*, 6 Binn. 509, 512, 3 Yeates 362, 363 (Pa.1802), the same year that the Private Road Act of 1802 was enacted. In that case, a landowner challenged the constitutionality of a 1792 Act of the General Assembly authorizing a turnpike company to build an artificial road from Philadelphia to Lancaster and to enter his land without providing for compensation for his land or "for the injury done to his improvements." *Id.* at 511, 3 Yeates at 371. Our Supreme Court framed the issue as:

> what breadth the said road shall be, so as the same shall not exceed twenty-five feet, and such road shall be recorded by the court." The person or persons requesting the petition were charged by the Act with the responsibility for paying damages to any person with land upon which the road would be constructed.

**17.** That private roads were considered part of the road system is illustrated by *In re Spear's Road*, 4 Binn. 174 (Pa.1811). In answer to the objection to the petition requesting the

The validity of the [Turnpike Act] is impeached by its being repugnant to the constitution of *Pennsylvania*, which directs that no man's property shall be taken for public use, without his own consent or that of his legal representatives, nor without compensation.

> To this it is answered, that the road or tract of the road, running through the plaintiff's land, was not his separate property, for that he held it as a trustee for the public, under the grant of the proprietaries of *Pennsylvania*, in which he was allowed beyond the quantity of land actually purchased and paid for, six per cent for roads and highways. (Emphasis in the original).

*Id.* at 511, 3 Yeates at 371.

It then went onto explain the different kinds of roads and highways recognized in Pennsylvania, including private roads:

> This will lead us to consider the different kinds of lawful roads and highways in *Pennsylvania*. There are and have been for a great length of time, three different kinds of roads. 1st. The *great provincial* roads, called in the act of 1700, the "king's highways" or "public roads," which were laid out by order of the governor and council. 2d. The roads or *cartways* leading to such great provincial roads, laid out by order of the justices of the county courts, after a return of certain viewers, that the same was necessary for the convenience of the

laying out of a road that the "The petitioners for the road [did] not state whether they pray for a *public* or *private* road," our Supreme Court stated that was not a defect because "[it] is not at the option of the petitioners whether it shall be public or private; that is to be judged of by the viewers, who are directed by the act, to state particularly in their report, whether they judge the same necessary for a public or private road." *Id.* at 177. (Emphasis in original.)

public. Such parts of these roads as run through any man's *improved ground,* were to be paid for out of the county stock. The third kind were called *private* roads, likewise laid out by order of the county court, on the application of any persons for a road to be laid out from or to their plantations or dwelling places, to or from the highways. The improved grounds through which these roads were run, were directed to be paid for by those, at whose request and for whose use the same were laid out.

*Id.* at 511–512, 3 Yeates at 371.

After explaining the changes to the concessions made by William Penn in the Act of 1700, namely, that each purchaser would be granted six percent in additional land for roads, the Court went on to explain what type of roads were allowed to be constructed out of that six percent, stating:

The quantity of six per cent was however fixed as the permanent quantity to be added to every man's land for that purpose; and from that early period to the present time, no grant has been made either by the proprietaries or commonwealth, without this addition of six per cent, expressly for the purpose of contributing to the establishing the roads or highways. [*sic*] It is true, it is not for these great roads alone, that they are to contribute, as but few of them are necessary; but as by the law of 1700, although a compensation is directed to be made for the *improved* land of any person, through which the second species of roads or cartways are run, yet as to the woodland or unimproved ground, there is no compensation to be made, evidently contemplating their liability to contribute on account of the additional six per cent granted them to supply the roads

and highways;—although in this early arrangement, there might be a chance that certain purchasers might be obliged to contribute more than six per cent to the roads, yet it might possibly have been foreseen, that scarce any instance of that would occur, without an equivalent likewise accruing to the purchaser, from the vicinity of such public roads to their buildings and improvements.

*Id.* at 512–513, 3 Yeates at 372.[18]

Then it went on to address whether private roads were to be laid out of the six percent in additional land. Holding that it was because it was necessary for "public convenience," our Supreme Court stated:

Even in the latter law, [1735 Supplement] establishing *private* roads, the legislature appears to have contemplated the same liability in the purchasers to contribute to the roads, the allowance to be made by those who use the road being expressly confined to the *improved* lands, through which such roads run; considering, that though they ought to be paid for what by their labour they had made valuable, yet as to the land which lay in a state of nature, they were bound to contribute as much of it, as by the laws of the country, were deemed necessary for the public convenience.

*Id.* at 513, 3 Yeates at 373.

Three years earlier, in *Breckbill,* our Supreme Court had come to the same conclusion that the grantees of the six percent were trustees of that land for the public for laying out roads, including private roads, stating:

That as far as the six per cent allowance for roads, the grantees of land were mere trustees for the public.... For

---

18. See also *Petition of Herrington,* 266 Pa. 88, 109 A. 791 (1920); *Township of East Union v.* *Comrey,* 100 Pa. 362 (1882).

this additional quantity of land, the grantee never paid any price, nor rent: It was not even subject to taxation. These facts cannot be otherwise accounted for, than by the admission of another fact, that, although the possession was transferred, the government reserved the right to resume it at will, and without paying a compensation. The early laws of the Province bear the same inflexible aspect. There was no provision made for compensating any damages in establishing a highway, or public road; and *with respect to private roads leading into the highway, provision was only made for compensating the damages done to improved land.* 1 Vol. 16, 289, 290. Dall. Edit. (Emphasis added.)

*Breckbill,* 3 Dall. 496, 500.

From the beginning of the Commonwealth then, private roads were considered part of the public road system to be laid out with six percent given to the original property owners for the construction of roads. In effect, when the six percent was given to the original landowners, and "their heirs and assigns," there was created an incorporeal burden on all the land of the Commonwealth that, in accordance with the Public Road Act, private roads were to be allowed to be laid when necessary.

### III.

██ Now to the effect *Forrester* has on the constitutionality of the Private Road Act. The issue in that case was whether the Agricultural Lands Condemnation Approval Board (ALCAB) was required to approve the opening of a private road under the Private Road Act when that road was in an Agricultural Security Area

(ASA). Section 13(a) of the Agricultural Area Security Law, Act of June 30, 1981, P.L. 128, *as amended,* 3 P.S. § 913(a), states that no agency of the Commonwealth, political subdivision, authority, public utility or other body "having or exercising powers of eminent domain shall condemn any land within an ASA unless prior approval has been obtained from the ALCAB." To decide the issue, our Supreme Court had to determine whether the opening of a private road under the Private Road Act was an exercise of the power of eminent domain. In a fractured non-precedential decision regarding the constitutionality of the Private Road Act, Chief Justice Cappy issued the plurality opinion announcing the judgment of the Court, while Justice Saylor concurred in the Judgment and Justice Newman dissented.[19]

Chief Justice Cappy wrote that ALCAB approval was not needed because the laying out of a private road did not involve a taking under eminent domain because that power was only exercised for a public purpose, which the opening of a private road did not advance. To arrive at this conclusion, Chief Justice Cappy reviewed prior Pennsylvania Supreme Court decisions discussing the Private Road Act's constitutionality. He deemed *Waddell's Appeal* to be unpersuasive and dicta and that *Pocopson Road* provided an insubstantial foundation for its disposition of this issue. Addressing whether the goals of the Private Road Act carried out a public purpose, the Court conceded that "society as a whole may receive a collateral benefit when landlocked property may be accessed by motorized vehicles, and thus presumably put to its highest economic use," but ultimately concluded that the primary beneficiary of

---

**19.** In *Forrester,* Justices Eakin and Castille joined with Chief Justice Cappy to create a plurality. A plurality opinion has no prece-

dential value. *Bilt–Rite Contractors, Inc. v. Architectural Studio,* 581 Pa. 454, 866 A.2d 270 (2005).

the opening of a private road was the private individual or entity who petitioned for such relief. 575 Pa. at 370–71, 836 A.2d at 105–06. Because the Court held that the opening of a private road did not accomplish a public purpose, it went on to conclude that opening a private road in an ASA could not be seen as an exercise of the power of eminent domain and did not require the prior approval of ALCAB.

Justice Saylor concurred in views expressed by Justice Newman in her dissenting opinion that Chief Justice Cappy's opinion interpreting the Private Road Act as implicating little or no public interest undermined its "ostensible constitutionality." 575 Pa. at 371, 836 A.2d at 109. Focusing on the legislative findings underlying Section 13(b) of the Agricultural Area Security Law, 3 P.S. § 913(b), and the fact that its relevant provisions are directed at entities traditionally associated with the power of eminent domain, Justice Saylor concluded that a proceeding under the Act represents an exercise of eminent domain. However, he also determined that the exercise was not accomplished by one of the entities listed in 3 P.S. § 913(b), and, instead, was carried out through a court of common pleas on behalf on an individual property owner. Therefore, Justice Saylor concurred only in the order to affirm this Court.

Justice Newman filed a dissenting opinion to which Justice Nigro joined, where she asserted that although the individual property owner might be the "immediate beneficiary of the opening of a 'private road,'" she disagreed with the majority because she viewed the public benefits of the Private Road Act as "important and essential to the existence of our society." 575 Pa. at 377, 836 A.2d at 109. Justice Newman first discussed the public benefits derived from the establishment of a private road that creates a passageway from a landlocked property to a public highway, citing to *Palairet's Appeal,* 67 Pa. 479, 492, where the Pennsylvania Supreme Court stated:

> [A private road] is part of the system of public roads, essential to the enjoyment of those which are strictly public; for many neighborhoods as well as individuals would be deprived of the benefit of the public highway, but for outlets laid out on private petition and at private cost, and which are private roads in that sense, but branches of the public roads and open to the public for purposes for which they are laid out.

Justice Newman determined that under Article I, Sections 1 and 10 of the Pennsylvania Constitution and the cases mentioned above, the constitutionality of the Private Road Act "rests entirely on the existence of public benefits derived from the establishment of a 'private road.'" She further stated that by declaring the Private Road Act to have little or no public interest, the Court "essentially invalidated the entire scheme of private road construction that has existed in this Commonwealth since the eighteenth century." 575 Pa. at 365, 836 A.2d at 106.

Tellingly, in response to Justice Newman's dissent, Chief Justice Cappy noted:

> The dissent asserts that this finding *de facto* renders the [Private Road] Act unconstitutional. Yet, the constitutionality of the Act is not before this court; rather, this claim is raised *sua sponte* by the dissent. As we are averse to address any issue, particularly one of constitutional dimension, when that issue is not before the court, we decline to respond to the dissent's argument.

575 Pa. at 371, n. 4, 836 A.2d at 106, n. 4.

█ Even though non-precedential, the Association asks us to adopt the reasoning of Chief Justice Cappy's Opinion in Sup-

port of Judgment and declare the Private Road Act unconstitutional. We decline to do so for several reasons. First, as even Chief Justice Cappy acknowledged, the constitutionality of the Private Road Act was not before the Supreme Court in *Forrester*, leaving unaffected its precedent in *Pocopson Road*, *Waddell's Appeal* and *Palairet's Appeal.*

Second, when the six percent for the construction of roads was attached to land warrants without cost, it placed a binding obligation on all landowners in Pennsylvania and "their heirs and assigns, in their lands and tenements," to allow for the construction of private roads. The laying out of private roads is not a taking in the ordinary sense, but an incorporeal burden on those whose lands the private road is to traverse to be exercised by those seeking a private road in the manner determined by the General Assembly.

Finally, even if we were to use a traditional takings analysis to determine the constitutionality of the Public Road Act, a public purpose is served by allowing the laying out of roads over the land of another. Although the private property owner who petitioned for the private road certainly gains from the opening of the road, the public gains because otherwise inaccessible swaths of land in Pennsylvania would remain fallow and unproductive, whether to farm, timber or log for residences, making that land virtually worthless and not contributing to commerce or the tax base of this Commonwealth. All of this, plus the fact that private roads are considered part of the road system of Pennsylvania, equate with the conclusion that a public purpose is served by the Private Road Act provisions that allow for the taking of property of another for a private road to give access to landlocked property.

For the foregoing reasons, we hold that the Private Road Act does not violate ei-

ther the Fifth Amendment to the United States Constitution or Article 1, §§ 1 and 10 of Pennsylvania's Constitution. Accordingly, we affirm the order of the trial court and remand this matter to the trial court for the appointment of viewers.

Judge McGINLEY did not participate in the decision of this case.

### ORDER

AND NOW, this 11th day of July, 2008, the order of the Court of Common Pleas of Allegheny County, dated October 26, 2007, is affirmed and we remand this matter to the trial court for the appointment of viewers.

Jurisdiction relinquished.

DISSENTING OPINION BY Judge SMITH–RIBNER.

I respectfully disagree with the majority's decision. Most importantly, I cannot agree with the reasoning stated in the majority's opinion that "[a]lthough the private property owner who petitioned for the private road certainly gains from the opening of the road, the public gains because otherwise inaccessible swaths of land in Pennsylvania would remain fallow and unproductive, whether to farm, timber or for residential use, making them virtually worthless and not contributing to commerce or the tax base of this Commonwealth." Majority Op. at 72. The majority's reasoning does not justify taking Appellants' private property for the private and sole benefit of Appellee to gain access to his private property. Rather, I agree with Appellants that the Allegheny County Court of Common Pleas erred in overruling their "unconstitutional taking" preliminary objection to Appellee's petition for the appointment of a board of viewers filed in February 2004 pursuant to Section 11 ("Proceedings to open private

roads") of the Act commonly known as the Private Road Act, Act of June 13, 1836, P.L. 551, *as amended*, 36 P.S. § 2731, and served upon Appellants more than two and one-half years later.[1]

Appellants objected to the taking of their private property under the Private Road Act for the private use and benefit of Appellee to allow access to his landlocked parcel of land in South Fayette Township near the Hickory on the Green development. As the trial court stated, Hickory on the Green Homeowners Association serves as a homeowners' association for the residents in the Hickory on the Green subdivision. Appellant Mary Lou Sorbara owns land that lies between Appellee's property and the subdivision, and the remaining Appellants own property in the subdivision and might have an interest in the land over which Appellee sought to locate a private road. Appellee pleaded that he had no access to his land other than by traveling over Sorbara's property to the Hickory on the Green property and over the private portion of Clubview Drive, which is a public road in the subdivision that becomes private as it crosses the Hickory on the Green property to its boundary with Sorbara's property. Appellee petitioned to establish a road from the easterly end of the public portion of Clubview Drive over the Hickory on the Green property and then over Sorbara's property to Appellee's land.

In overruling the preliminary objection as to unconstitutional taking, the trial court noted that in *In re Laying Out a Private Road*, 405 Pa.Super. 298, 592 A.2d 343 (1991), the Superior Court commented that allowing a private citizen essentially to exercise eminent domain power raises constitutional implications. In addition, the trial court observed that the Supreme Court in *In re Forrester*, 575 Pa. 365, 836 A.2d 102 (2003), placed the constitutionality of the Private Road Act in doubt. Although *Forrester* did not directly address the act's constitutionality, the underlying issue was whether the opening of a private road under the act constituted an exercise of eminent domain power by serving a public purpose. The *Forrester* court determined that the Private Road Act did not serve a public purpose because society in general would not be the primary beneficiary of a road whose use is limited to the petitioning party, notwithstanding a collateral economic benefit to the public from having access to the landlocked property. The trial court noted concerns espoused in the concurring and the dissenting opinions in *Forrester* that the constitutional basis of the Private Road Act was undermined by finding that it satisfied only private interests. Nonetheless, the trial court held that the Private Road Act was constitutional, relying *inter alia* upon a Supreme Court decision over 150 years ago in *Pocopson Road*, 16 Pa. 15 (1851).

In *Forrester* the issue presented was whether the Agricultural Lands Condemnation Approval Board (Agricultural Board) must approve the opening of a

---

1. Section 11 states in relevant part:
   The several courts of quarter sessions shall ... upon the petition of one or more persons ... for a road from their respective lands or leaseholds to a highway or place of necessary public resort, or to any private way leading to a highway ... direct a view to be had of the place where such road is requested, and a report thereof to be made....

Section 12 of the Act, 36 P.S. § 2732 ("Proceedings on report of viewers"), states in relevant part:
   If it shall appear by the report of viewers to the court ... that such road is necessary, the said court shall direct what breadth the road so reported shall be opened, ... and thenceforth such road shall be deemed and taken to be a lawful private road.

private road from a private landowner's 22–acre landlocked tract of land in Franklin County. The landowner petitioned for the appointment of a board of view under the Private Road Act to locate and open a private road over farmland owned by the appellants. The private road was in an agricultural security area as defined by the Agricultural Area Security Law (Agricultural Law), Act of June 30, 1981, P.L. 128, *as amended,* 3 P.S. §§ 901–915, and the appellants challenged the petition on the basis that a private road may not be opened without prior approval of the Agricultural Board. The board of view determined that prior approval of the Agricultural Board was not required to open a private road and found that the landowner was entitled to have the road opened for access to his landlocked property. The board of view fixed the location of the road and assessed damages against the petitioning landowner. The trial court and this Court affirmed, and on appeal by the appellants the Supreme Court affirmed this Court after ultimately ruling that prior approval by the Agricultural Board was not required before opening a private road on land in an agricultural security area.

To decide the question presented in *Forrester* the Supreme Court had to determine first whether the opening of a private road represented an exercise in eminent domain. Section 13(a) and (b) of the Agricultural Law, 3 P.S. § 913(a) and (b), provided that "[n]o agency of the Commonwealth" and "[n]o political subdivision, authority ... or other body having or exercising powers of eminent domain shall condemn any land within any agricultural security area ... unless prior approval has been obtained from [the Agricultural Board]." In reviewing case law predating the turn of the 20th century, including *Waddell's Appeal,* 84 Pa. 90 (1877), the court noted one instance in which it directly had dealt with whether

the opening of a private road effectuated a public purpose, *i.e.,* in *Pocopson Road.* In *Pocopson Road* the Supreme Court rejected the argument that opening a private road under the Private Road Act constituted a taking for a purely private use, but it agreed in *Forrester* that its decision in *Pocopson Road* was "wholly unsupported by any reasoning." *Forrester,* 575 Pa. at 369, 836 A.2d at 105.

Because of the insubstantial foundation laid for the Pocopson Road decision, the Supreme Court discounted that case as having any precedential value in analyzing the question before it in *Forrester.* It eventually held that because the opening of a private road under the Private Road Act "does not accomplish a public purpose, it cannot be seen as the exercise of the power of eminent domain." *Id.,* 575 Pa. at 371, 836 A.2d at 106. The Supreme Court analyzed prior case authority and relied on a settled rule of law that "a taking will be seen as having a public purpose only where 'the public is to be the primary and paramount beneficiary of its exercise.'" *Id.,* 575 Pa. at 370, 836 A.2d at 105 (citing *In re Condemnation of Bruce Avenue,* 438 Pa. 498, 505, 266 A.2d 96, 99 (1970)).

The Supreme Court agreed in *Forrester* with the contention that the opening of a private road could not be considered a taking for a public purpose, noting with approval the reasoning that although society generally might receive some collateral benefit when a landowner has access to his or her landlocked property, it nonetheless is a stretch of logic to say that giving limited private access constitutes a public purpose. It explained that the primary beneficiary of the opening of a private road is the private landowner who petitions for the private road, and while recognizing that society might receive some benefit it nevertheless concluded very clearly that the general public cannot be presumed to

be the primary beneficiary of a private road limited in use to the petitioning party. In a footnote the court stated that a private road by its very term is not open to the general public and that the private road is created for a specific person or group of persons. Under the Private Road Act, any others who wish to use the private road must obtain court permission. Section 17 of the Private Road Act, 36 P.S. § 2761. Because the Private Road Act satisfied only private interests, the power of eminent domain was not involved. To arrive at its ruling the court did not engage in *obiter dictum* or other unnecessary exercise. Rather, its decision rested on its conclusion that no public purpose is achieved from taking private property under the act.

The Supreme Court's reasoning and holding in *Forrester* squarely calls into question the constitutionality of the Private Road Act. The act allows a private landowner, as here, to petition for the appointment of a board of view to locate and open a private road for the sole benefit of the private landowner. This act represents a violation of basic rights that citizens have in this Commonwealth, that is, the right to enjoyment and ownership of their private property subject only to seizure by an entity clothed with the power of eminent domain for a public use. Notably, the concurring and dissenting opinions in *Forrester* recognized that the court's interpretation that a taking under the Private Road Act "implicates" little or no public interest effectively invalidates the scheme of private road construction.

In *Redevelopment Authority of Erie v. Owners or Parties in Interest*, 1 Pa. Cmwlth. 378, 390, 274 A.2d 244, 250 (1971), this Court reasoned as follows:

Nothing, of course, is better settled than that property cannot be taken by government without the owner's consent for the mere purpose of devoting it to the private use of another. In Lance's Appeal, 55 Pa. 16, 25 (1867), the Supreme Court held that the power of eminent domain can never be exercised except for a public purpose supposed and intended to benefit the public, and that "after the right has been exercised the use of the property must be held in accordance with and for the purposes which justified its taking. Otherwise, it would be a fraud on the owner, and an abuse of power."

In Philadelphia Clay Co. v. York Clay Co., 241 Pa. 305, 309-310, 88 A. 487, 488 (1913), the court stated the following: "While the power of the Legislature to invest individuals or corporations with the right to take private property for a public use is clearly recognized by the Constitution, there is not a suggestion anywhere that private property may be taken for a private use. It has been uniformly held by the courts in our own state as well as in other jurisdictions that under the right of eminent domain private property can only be taken for a public use, and that it is not within the power of the Legislature to invest either an individual or a corporation with the right to take the property of a private owner for the private use of some other individual or corporation, even if a method is provided for ascertaining the damages and paying what shall be deemed just compensation. The underlying principle is that the owner of property has the right to the uninterrupted use and enjoyment of it against all the world, subject, however, to the sovereign right of the state to take so much of it as may be necessary to serve the various public uses to which it may be properly subjected."

*See also Kelo v. City of New London*, 545 U.S. 469, 125 S.Ct. 2655, 162 L.Ed.2d 439

(2005); *Middletown Township v. Lands of Stone*, 595 Pa. 607, 939 A.2d 331 (2007) (reaffirming a fundamental principle of constitutional law that private property may not be taken unless the public is to be primary beneficiary of that taking).

The Private Road Act permits a private landowner to acquire the private property of another for the sole benefit of the petitioning party, thereby representing an unconstitutional taking of one's private property in violation of the Fifth Amendment to the United States Constitution and Article 1, Section 1 of the Pennsylvania Constitution. Moreover, I agree with the observation made by the Superior Court in *In re Laying Out a Private Road* that the Private Road Act allows a private citizen to condemn his neighbors' land for his own purposes, which in the end raises constitutional implications.[2] The Superior Court encouraged the legislature to revisit the statutory scheme of allowing a taking of private property for a private road where governing statutes do not adequately protect the private property owner whose property is being taken.

As a final matter, I point out the Michigan Supreme Court's decision in *Tolksdorf v. Griffith*, 464 Mich. 1, 626 N.W.2d 163 (2001). That case involved owners of landlocked property who sued adjoining landowners and a township supervisor to establish a prescriptive easement and to compel the supervisor to file proceedings to open a private road under the Opening of Private Roads and Temporary Highways Act (the private roads act), M.C.L. §§ 229.1–229.11. In reversing the Court of Appeals' decision, the Supreme Court held that the act was unconstitutional because it authorized a taking of private property that primarily benefited a private rather than a public purpose. The court relied upon the Takings Clauses of the United States and Michigan Constitutions.

In striking down the private roads act the Michigan Supreme Court expounded as follows:

> We are unconvinced that the public is the predominant interest served by the private roads act. The very language of the act reveals that it is concerned with private roads having, presumably, a private not a public benefit. Also, the act does not require the state to compensate the landowner, but, rather, the private person petitioning for the private road.... The private roads act uses the state's power of eminent domain to convey an interest in land from one private person to another.

> The Court of Appeals has opined that the private roads act merely supplements the already existing law of private easements.... However, the *McKeigh-*

---

**2.** In *In re Laying Out a Private Road*, the owner of landlocked property petitioned to open a private road from his land in Lycoming County across an adjacent farm owned by the appellants (David and Gloria Zeafla) to a public road. The board of view concluded that the private road should be opened across the appellants' farm as requested. On further appeal to the Superior Court they argued that there was no necessity for a private road because the appellee had a permissive right-of-way across the farm to reach his property; that if necessity existed the board abused its discretion in opening the private road; and that the board did not have sufficient evidence to make a finding as to damages and that the appellants were entitled to a jury trial. The Superior Court agreed with the trial court that the board's finding that the appellee's property was landlocked implied the requisite necessity and agreed that the board did not abuse its discretion in granting the private road across the appellants' farm. Based on the damages issue, however, the Superior Court vacated and remanded for further proceedings after concluding that expert evidence was required as to the value of the appellants' farm before and after the taking and that they were entitled to a jury trial on the amount of damages.

*an II* [*McKeighan v. Grass Lake Township Supervisor*, 234 Mich.App. 194, 593 N.W.2d 605 (1999), *overruled by Tolksdorf*] dissent accurately remarked that there is a difference between easements by necessity and the interest created by operation of the private roads act:

As noted in Judge Holbrook, Sr.'s dissent in *White Pine Hunting Club* [*White Pine Hunting Club v. Schalkofski*, 65 Mich.App. 147, 237 N.W.2d 223 (1975)] ..., the analytical basis for enforcing a common-law easement by necessity is the assumption that the parties who have originally created the landlocked parcel intended that the owner of the landlocked parcel have access to the land over the other's parcel. Accordingly, with a common-law easement by necessity, "all the court is really doing is enforcing the original intent of the parties."

An implied easement also arises only when the land on which the easement is sought was once part of the same parcel that is now landlocked.... Missing from the private roads act is some conduct by the party whose land is burdened or his predecessor, indicating assent to the burden imposed.

*Tolksdorf*, 464 Mich. at 9–10, 626 N.W.2d at 168–169 (citations omitted). I agree with the court's conclusion that the primary benefit under the private roads act inures to landlocked private landowners who wish to open a private road on private property of another. Moreover, any benefit that might accrue to the public at large "is purely incidental and far too attenuated to support a constitutional taking of private property." *Id.*, 464 Mich. at 11, 626 N.W.2d at 169. Such is the case here as Appellee is the primary beneficiary of the taking of Appellants' private property; further, any incidental and attenuated benefits that might accrue to the public from

this taking belie the proposition advanced by the majority as quoted in paragraph one above. Accordingly, I would reverse the order of the trial court because it erred in overruling the preliminary objection based on the unconstitutional taking of Appellants' private property.